Anthony J. DELLAGROTTA et al.

v.

Cynthia A. DELLAGROTTA.

No. 2002–0046–Appeal.

Supreme Court of Rhode Island.

May 19, 2005.

Jeffrey B. Pine, Providence, for Plaintiff.

Robert S. Ciresi, North Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Supreme Court on March 9, 2005, on cross-appeals filed by the plaintiffs, Anthony J. Dellagrotta (Anthony Sr.) and Audrey M. Dellagrotta (Audrey or, collectively, plaintiffs), and the defendant, Cynthia A. Dellagrotta (Cynthia or defendant), the former wife of plaintiffs' son, Anthony Dellagrotta, Jr. (Anthony Jr.). The subject matter of this dispute is a house—a house that was intended to become a lovely home for a newly married couple. In reviewing the record in this case, we have been afforded all too close a look at the bride and groom, their in-laws, and how this home was reduced to being the decaying carrion of a moribund union.

## I

### Facts and Travel

In November 1997, shortly after they became engaged, Anthony Jr. and Cynthia contacted a realtor, Irene Goulet (Goulet), to help them locate the perfect marital domicile. One of the properties Goulet showed Anthony Jr. and Cynthia was 925 Tarklin Road, Burrillville (the house or the property). The couple brought Anthony Sr. to see the house, and on December 3, 1997, Anthony Sr. and Audrey executed a sales agreement, agreeing to purchase the property for $185,000. The plaintiffs obtained title at a closing conducted on December 31, 1997, and Anthony Jr. moved in; Cynthia joined him after they were married on February 15, 1998.

To renovate the property, the couple and their parents invested both money and labor. Although the families' shared vision for the house was realized, within a few short years, the marriage broke down, and in March 2001, Anthony Jr. moved out of the house. Cynthia continued to live in the house for some period after Anthony Jr.'s departure, but then, on May 3, 2001, plaintiffs sent defendant a notice of termination of tenancy, giving her until June 30, 2001, to vacate the property.

The plaintiffs filed a complaint in the Sixth Division District Court on July 3, 2001, seeking both possession of the property and money damages. The defendant filed a responsive pleading setting forth an answer and three counterclaims. The first sought legal title to the house based on the doctrine of promissory estoppel. The second counterclaim demanded title to the property and compensation under a theory of unjust enrichment, and finally, defendant urged the court to impose a constructive trust on the property for her benefit. The defendant then moved to transfer the case to Superior Court on the ground that the District Court lacked subject matter jurisdiction over the equitable claims. The plaintiffs responded by moving to dismiss defendant's counterclaims. The District Court judge denied defendant's motion to transfer, granted plaintiffs' motion to dismiss the counterclaims, and proceeded to trial. The trial judge entered judgment

for plaintiffs, awarding both possession and costs, and defendant claimed an appeal to the Superior Court.

A nonjury trial commenced on November 15, 2001. Anthony Sr. testified that he and Audrey had an informal agreement with Anthony Jr. concerning the house, pursuant to which Anthony Jr. and Cynthia could live in the house rent-free, provided that they pay all the operational costs associated with the house, such as taxes and utility bills. When Anthony Jr. and Cynthia separated, however, he decided to terminate the agreement with respect to Cynthia and directed that the notice of termination of tenancy be sent to her. Anthony Sr. denied telling anyone that he purchased the house as a gift for Anthony Jr. and Cynthia. Although he admitted discussing the house with Cynthia and telling her that she had done a beautiful job improving the house, he denied having any discussions with her about its ownership.

Anthony Sr. admitted that improvements were made in almost every room of the house. He explained that he hired some of the workers, but that other work was done at the direction of Anthony Jr. and Cynthia. Although he could produce no records to support his testimony, Anthony Sr. said that he paid for the improvements, giving Anthony Jr. between $6,000 and $9,000 in cash to pay a worker named Ralph and to cover other expenditures related to the house.

Audrey confirmed her husband's testimony about the agreement with Anthony Jr. She also denied personally having any discussions with Cynthia about this agreement.

The plaintiffs presented the testimony of Kevin O'Neil (O'Neil), a real estate agent, who testified that the fair monthly rental value of the house was between $1,800 and $2,000 for the years 1998 and 1999, between $2,000 and $2,200 for 2000, and $2,750 for 2001.

Finally, plaintiffs called Sean M. Fahey (Fahey), a real estate appraiser, as an expert witness to establish the increase in the house's value attributable to Cynthia and Anthony Jr.'s improvements. Fahey testified that he viewed the exterior of the house around the time plaintiffs purchased it and examined both the interior and exterior in July and November 2001. In his opinion, the improvements attributed to Cynthia and Anthony Jr. added $35,000 to $40,000 to the value of the house.

The defendant testified that immediately after the closing, she and her father, Albert Conca, Jr. (Albert), started improving the house. She explained that, in January 1998, she and Anthony Jr. opened a joint bank account from which the money to pay for the home improvement materials, laborers, and all other household bills was drawn. Cynthia catalogued the money she and Anthony Jr. deposited into the bank account: $4,000 to $5,000 of Cynthia's savings; $20,000 from the sale of Anthony Jr.'s boat; $12,000 given to them by Cynthia's parents as a wedding gift; $2,000 in wedding gifts; and the couple's earnings. She entered into evidence all the invoices and receipts she could find and explained that the laborer, Ralph, had been paid in cash. In addition, defendant testified that she and Anthony Jr. paid $16,956 in taxes and insurance on the property.

When asked about her understanding concerning ownership of the house, defendant testified that she believed it to be a wedding gift. She said that, after the renovations were completed, Anthony Sr. commented on the "wonderful job [they had] done making the house what it was, and that he was happy he could buy [the house] as a wedding gift for [them]." Although defendant knew that the deed to

the house was in Anthony Sr.'s and Audrey's names, she said that her understanding was that Anthony Sr. would put the house in the couple's name "if we saved our money." When asked why she did not ask Anthony Sr. for the deed to the house, Cynthia said "[b]ecause I thought that would not be proper[,] considering [that] he bought us the house as a wedding gift." Cynthia testified she believed that plaintiffs would "put the house in our name[s]." She explained that she made improvements to the house because "it was my home and it needed to be improved, and I wanted it to be improved and [to] look beautiful."

Cynthia presented the testimony of the realtor, Goulet, and William Peter Rademsky (Rademsky), a friend of her parents. Both witnesses testified that Anthony Sr. bragged on more than one occasion that he gave the house to Anthony Jr. and Cynthia. Goulet testified that Anthony Sr. expressed his intention to make a gift of the house when he inspected it in November 1997. Rademsky recalled two occasions that Anthony Sr. told him that the house was a wedding gift to the couple. Rademsky also recounted a conversation he had with Anthony Sr. and Audrey at an Easter gathering. He said that Audrey described how nicely the house had turned out, and that Anthony Sr. added "he was very proud that [Anthony Jr. and Cynthia] were to have a home that looked so beautiful, and he and his wife * * * were happy to provide this to [them]."

The defendant's parents, Albert and Joan Conca (Joan), also testified on her behalf. Albert recounted how Anthony Sr. solicited his help with the renovations to the house, asking whether Albert could make the house look good if Anthony Sr. bought it "for the kids." Joan also remembered Anthony Sr. saying that "he was going to purchase the house for the kids if [Albert] thought he could get it in good condition." In addition, Joan recalled Anthony Sr. characterizing the house as a gift to her daughter and son-in-law on at least two other occasions.

The defendant also called Peter M. Scotti (Scotti) as an expert real estate appraiser to testify to the house's increased value as a result of the improvements made by Anthony Jr. and Cynthia. In describing the methodology used in making such an assessment, Scotti explained that he compared the value of the house before and after the improvements, taking into consideration the overall market trends for the relevant period. To gain an understanding of what improvements were made to the house after plaintiffs purchased it, Scotti reviewed the original realtors' listing information, a list of improvements that defendant gave him, and two videotapes of the house from February 1998 and September 2001. Based on five contemporaneous sales of comparable homes, he estimated that the current fair market value of the house in its improved state was $343,000. Scotti further indicated that he evaluated property sales in Burrillville between 1998 and 2001 to establish the average change in value of similar properties as 28 percent. Adding 28 percent to the original purchase price of $185,000, Scotti set the current value of the house in an unimproved state at $237,000. He testified that the increase in value attributable to the improvements made by Cynthia and Anthony Jr. was $106,000, representing the difference between the fair. market value with ($343,-000) and without improvements ($237,000).

On November 27, 2001, the trial justice issued a bench decision and found that Cynthia was not entitled to an ownership interest in the property but was entitled to compensation for the increased value attributable to the improvements to the

house. He explained that his decision was shaped by a finding that, although "the testimony of most of the witnesses in this matter was credible[,] * * * some of the testimony that was offered, specifically by Anthony [Sr.], was not credible[,] * * * [and] the testimony of Cynthia * * * on some points was also not credible."

The trial justice concluded that Cynthia's claim of title based on the purported gift from Anthony Sr. and Audrey failed for lack of proof. He credited the testimony of Cynthia's father and Rademsky, finding that Anthony Sr. exhibited an intention to make a gift of the house to Anthony Jr. and Cynthia. However, he found that, although defendant proved that Anthony Sr. intended to give the house to "the kids," the house was owned by Anthony Sr. and Audrey, jointly, and there was no evidence that Audrey had exhibited the requisite donative intent.

The trial justice rejected Cynthia's ownership claim based on promissory estoppel and her request that the court impose a constructive trust on the property. He determined that it would be unjust to enforce Anthony Sr.'s promises to give the house to Anthony Jr. and Cynthia, in the absence of evidence of statements made by Audrey that reasonably would have induced Cynthia to act. The trial justice found that:

"There is no evidence that Audrey * * * made any statements or promises to Cynthia * * * which should have reasonably caused her to take action or forbear from taking certain action. * * * It would be unjust to award the property to Cynthia * * * in derogation of [Audrey's] rights, based upon the unilateral statements of * * * [Anthony Sr.]."

With respect to the imposition of a constructive trust, the trial justice again referred to the absence of evidence of any declarations made by Audrey that she and Anthony Sr. wished to make a gift of the house to Anthony Jr. and Cynthia. In addition, the trial justice reasoned that Cynthia failed to show that Anthony Sr. and Audrey purchased the house in a fiduciary capacity or that they breached a fiduciary duty owed to Cynthia. The trial justice found that:

"[A]gain, there's no evidence that proves by clear and convincing evidence that Audrey * * * did anything that was either fraudulent or deceitful, vis-[à]-vis * * * Cynthia * * *, as it pertained to the home. Before the property was acquired on December 31, 1997, there is no evidence that either [Audrey or Anthony Sr.] were in a fiduciary capacity with * * * Cynthia.

"Cynthia * * * is required to prove that there was a fiduciary relationship[,] which was breached and which should require a reconveyance of the property. She has not sustained her burden of proof on the claim of a constructive trust."

The trial justice went on to hold that plaintiffs would be unjustly enriched if they were permitted to retain the house without compensating Cynthia for the value of the improvements she made to the property. He found that when defendant made the improvements, she "reasonably believed that the property was intended to be hers." He further found that defendant proved that she expended $17,737.67 from the bank account held jointly with Anthony Jr. toward improvements to the house. In determining fair compensation for the increase in value, the trial justice considered the testimony of both real estate experts, Fahey and Scotti. He rejected Fahey's testimony as unhelpful, characterizing it as a "ballpark opinion" because it lacked an objective basis. The trial justice accepted Scotti's testimony that the property had

increased in value by $106,000 as a result of the improvements made by Cynthia and Anthony Jr. Combining the cost of the improvements with the increase in the house's value and dividing by two, presumably to account for the fact that the improvements were made with jointly owned money, the trial justice determined that defendant was entitled to $61,865.08 on her counterclaim for unjust enrichment.[1]

On their claim for trespass and ejectment (T & E), the trial justice found for plaintiffs, determining that they were the rightful owners of the house and, therefore, were entitled to damages for defendant's use and occupancy of the property. The trial justice found that plaintiffs gave proper notice of termination of tenancy to defendant, effective June 30, 2001. He accepted O'Neil's testimony, finding that $2,750 per month was the fair rental value of the property from July 1, 2001, through the time of the trial, November 2001, and determined that plaintiffs were entitled to recover $13,750 for use and occupancy, plus litigation costs.[2]

Judgment was entered on November 27, 2001, and a flurry of paperwork ensued. Both sides filed timely notices of appeal, as well as numerous posttrial motions. This Court remanded the case to the Superior Court for hearings on the posttrial motions.

The plaintiffs moved for a new trial on the limited basis that the trial justice made an error of law when arriving at defendant's award on her unjust enrichment counterclaim. The plaintiffs asserted that combining the figures representing the cost of improvements made to the house and the increase in value attributable to those improvements resulted in a double recovery. The defendant argued that in a nonjury case a motion for new trial cannot be used to reexamine the evidence. The trial justice denied plaintiffs' motion for a new trial, reasoning that he had made factual findings about the appreciation figure and the cost of the improvements.

The plaintiffs also moved for attorney's fees based on the Residential Landlord and Tenant Act, G.L. 1956 chapter 18 of title 34(act).[3] The defendant contended that the act did not apply because the parties were not subject to a rental agreement. The trial justice concluded that "there was an agreement between Anthony [Sr.] and Audrey * * * and Cynthia * * * for Cynthia * * * to reside at the premises," and by virtue of Cynthia's status as a tenant, plaintiffs were entitled to attorney's fees.[4]

1. There appears to be a small mathematical error in this calculation. The trial justice found the cost of the improvements to be $17,737.67 and the increase in value of the house to be $106,000. The sum of these two figures is $123,737.67 and dividing the sum by two yields a recovery of $61,868.84, instead of $61,865.08.

2. The trial justice later amended the judgment to include 12% interest from July 25, 2001, through the date of the original judgment, November 27, 2001, resulting in a total award of $14,428.08. The plaintiffs were also awarded $942.50 in litigation costs, from which $105 was subtracted to account for the $105 already paid to plaintiffs by defendant pursuant to an order of the District Court below.

3. Specifically, plaintiffs argued that they were entitled to an award of attorney's fees under G.L.1956 § 34–18–43, which provides:

"**Remedy after termination.**—If the *rental agreement* is terminated, the landlord has a claim for possession, for a sum for reasonable use and occupation subsequent to the termination, and for actual damages for breach of the rental agreement and reasonable attorney's fees." (Emphasis added.)

4. A separate hearing was held to determine the appropriate amount of plaintiffs' award of attorney's fees. The trial justice found that plaintiffs' counsel was entitled to a fee of

The defendant urged the court to exercise its discretion and grant her an award of attorney's fees, in the interest of fairness and justice. The defendant argued that the court's award of damages on her counterclaim for unjust enrichment sought to make her whole, and if she were required to pay her attorney's fees, she would not be whole. The trial justice denied defendant's motion, finding nothing in the conduct of plaintiffs to warrant such an award.

## II

### Issues Presented

On appeal, plaintiffs assign error to the finding in favor of defendant on her counterclaim for unjust enrichment. They argue that defendant was not entitled to restitution for the improvements she financed because she knew that plaintiffs held title to the property. In addition, plaintiffs argue that, even if defendant was entitled to a recovery, the trial justice erred in calculating the amount.

The defendant's primary challenge is to the trial justice's rulings in favor of plaintiffs on her promissory estoppel and constructive trust counterclaims. She argues that Audrey silently acquiesced in the statements Anthony Sr. made about donative intent. Alternatively, defendant assigns error to several of the trial justice's other findings. The defendant challenges the trial justice's award of damages to plaintiffs for her use and occupancy of the house from July 2001 through November 2001. She argues that, even if she did not possess equitable title to the house, there was no rental agreement governing her residency there. The defendant also challenges the trial justice's reliance on

$6,457. The defendant filed a timely notice of appeal pertaining to the award of plaintiffs'

O'Neil's testimony in setting the fair rental value for the house. As to the unjust enrichment award, defendant contends that the trial justice erred by reducing the amount by half. Lastly, defendant assigns error to the award of attorney's fees to plaintiffs and the denial of defendant's motion for attorney's fees.

## III

### Standard of Review

When we are called upon to review the findings of a trial justice sitting in a nonjury case, our standard of review is one of deference. *Vigneaux v. Carriere*, 845 A.2d 304, 306 (R.I.2004). " 'This Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.' " *Id.* However, we review questions of law *de novo*. *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I.2001).

## IV

### A

### The Promissory Estoppel Counterclaim

The defendant asserts that the trial justice erred in finding that she failed to demonstrate an ownership interest in the house under a promissory estoppel theory. She argues that she was entitled to rely upon Anthony Sr.'s promises and Audrey's "silent acquiescence" in his frequent and self-aggrandizing claims that he purchased the home as a wedding gift. Although we agree that defendant may not prevail on

attorney's fees.

her promissory estoppel counterclaim, we disagree with the path taken to arrive at that result.

Promissory estoppel operates to make a promise binding if the promise was "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person," the promise "does induce such action or forbearance" in reliance on that promise, and "injustice can be avoided only by enforcement of the promise." *Filippi v. Filippi*, 818 A.2d 608, 625 (R.I. 2003) (quoting *Alix v. Alix*, 497 A.2d 18, 21 (R.I.1985)). To invoke the doctrine of promissory estoppel, a promisee must demonstrate the existence of:

"1. A clear and unambiguous promise;

"2. Reasonable and justifiable reliance upon the promise; and

"3. Detriment to the promisee, caused by his or her reliance on the promise." *Id.* at 626.

The trial justice addressed the elements of a promissory estoppel claim, finding that "there were certain statements made by Anthony [Sr.] which a reasonable person would have expected would have caused the promisee, Cynthia * * *, to take some action or to forebear from taking certain action." The trial justice went on to find that Cynthia was induced to act by Anthony Sr.'s promise to convey the house, and "if the only parties to this matter were Anthony [Sr.] and Cynthia * * *, then * * * justice could only be afforded by enforcing the promise." According to the trial justice, it was Audrey's co-ownership of the house that tipped the scales back in plaintiffs' favor.

However, our careful review of the record reveals that the trial justice overlooked or misconceived crucial statements Cynthia made bearing on the clarity of Anthony Sr.'s promise. At trial, Cynthia testified to a conversation she had with Anthony Sr. about the house: "[Anthony Sr.] simply stated that [the house] was a wedding gift to Anthony [Jr.] and I [*sic* ], and at that point we would no longer get anything else. He [said that he] would like to see us save our money and[,] in time[,] put the deed in our name [*sic* ]." The defendant also testified that Anthony Sr. told her that "he would put the house in our name [*sic* ] *if* we saved our money." (Emphasis added.)

To make an inter-vivos gift, a donor must have "a present true donative intent" and "some manifestation such as an actual or symbolic delivery of the subject of the gift so as to completely divest the donor of dominion and control of it." *Black v. Wiesner*, 112 R.I. 261, 267, 308 A.2d 511, 515 (1973). When a gift consists of real property, the donor must manifest his or her intent by delivering a deed to the parcel. *Wetherill v. Moore*, 73 R.I. 140, 144, 54 A.2d 388, 390 (1947). The defendant's own testimony illustrates that Anthony Sr.'s statements did not amount to a "clear and unambiguous promise" to make a gift of the property, notwithstanding Audrey's silence. The defendant produced no evidence of a time frame set by Anthony Sr. and Audrey for delivering the deed, the amount of money Cynthia and Anthony Jr. must save to effectuate the gift, or that the couple otherwise met this condition. We are satisfied that Anthony Sr.'s statements did not manifest a clear and unambiguous promise to divest himself of dominion and control over the property. Because defendant cannot satisfy the first element of a claim for promissory estoppel, her counterclaim must fail, without regard to whether Audrey's silence in the face of Anthony Sr.'s promise was sufficient to bind her on that promise.

## B

### The Constructive Trust Counterclaim

The defendant argues that, by her silence, Audrey acquiesced in the allegedly fraudulent statements of Anthony Sr., and therefore, the trial justice erred by failing to impose a constructive trust on the house for defendant's benefit. She asserts that the trial justice made an error of law by finding that the existence of a fiduciary relationship is an essential element in a constructive trust claim. The defendant contends that the existence of a confidential relationship is legally sufficient, and that she produced clear and convincing evidence of such a relationship and fraudulent conduct sufficient to warrant the imposition of a constructive trust.

It is well settled that "[t]he underlying principle of a constructive trust is the equitable prevention of unjust enrichment of one party at the expense of another in situations in which legal title to property was obtained by fraud or in violation of a fiduciary or confidential relationship." *Renaud v. Ewart*, 712 A.2d 884, 885 (R.I. 1998) (mem.) (citing *Simpson v. Dailey*, 496 A.2d 126, 128 (R.I.1985)). The essential elements that the party seeking imposition of a constructive trust must prove by clear and convincing evidence are the existence of a fiduciary or confidential relationship between the parties *and* either a breach of a fiduciary duty or fraud resulting from the parties confidential association. *Id.*

Confidential or fiduciary relationships do not inherently exist between family members. *Simpson*, 496 A.2d at 128. We evaluate the facts and circumstances surrounding family member's dealings when considering whether a confidential or fiduciary relationship was at work. *Id.* at 128–29. In *Simpson*, we upheld a finding of a confidential relationship between a

sister and brother because the evidence demonstrated that they trusted each other and relied on each other for assistance with matters of great importance. *Id.* at 129. The sister claimed a right to annuity proceeds upon her brother's death, but the evidence showed that she had promised, if her brother predeceased her, to apply the proceeds toward the care and maintenance of her brother's wife and children. *Id.* at 127, 129. We concluded that a finding of a breach of the sibling's confidential relationship was warranted, and imposition of a constructive trust on the proceeds was necessary to prevent unjust enrichment. *Id.* at 128–29. We analogized the brother and sister in *Simpson* to another brother and sister pair in *Cahill v. Antonelli*, 120 R.I. 879, 390 A.2d 936 (1978). In *Cahill*, this Court upheld a finding of a confidential relationship because the evidence demonstrated that the sister trusted her brother, looked to him for advice, and enlisted him as her agent to clear up liens on a parcel of real property. *Id.* at 883, 390 A.2d at 939. The sister conveyed the property to her brother, subject to a promise that he would reconvey it back to her after taking care of the liens. *Id.* The brother died, never having transferred the property back to his sister. *Id.* at 881, 390 A.2d at 938. We affirmed both the finding that the brother abused his sister's trust and confidence for his own personal gain and the trial justices imposition of a constructive trust on the property. *Id.* at 883–84, 390 A.2d at 939.

Here, the trial justice found that defendant failed to demonstrate that a fiduciary relationship existed between her and plaintiffs. Our review of the record reveals no evidence of a fiduciary or confidential relationship between plaintiffs and defendant at the time plaintiffs purchased the house. Unlike in *Simpson* and *Cahill*, defendant's familial relationship with plain-

tiffs was prospective—at the time Anthony Sr. and Audrey purchased the property, Cynthia was merely their sons fiancée. More crucial to our analysis, in contrast with *Simpson* and *Cahill*, there is no evidence establishing a pattern of defendant's reposing trust and confidence in plaintiffs. Therefore, we discern no error in the trial justice's finding in favor of plaintiffs on the constructive trust counterclaim.

## C

### The Residential Landlord and Tenant Act

██ The trial justice found in favor of plaintiffs on their T & E claim under the Residential Landlord and Tenant Act, awarding them damages for defendant's failure to relinquish possession of the property, as well as attorney's fees and costs. The defendant asserts that the trial justice committed an error of law by applying the act in this case. She argues that the act does not apply because there was no rental agreement, or indeed, a landlord-tenant relationship between the parties. We agree.

██ The act supersedes the common law of residential landlords and tenants when the two bodies of law conflict. *Errico v. LaMountain*, 713 A.2d 791, 794 (R.I. 1998). It "applies to, regulates and determines rights, obligations, and remedies under a *rental agreement*, wherever made, for a dwelling unit located within this state." Section 34–18–7. (Emphasis added.) The act defines "rental agreement" as "all agreements, written or oral, and valid rules and regulations * * * embodying the terms and conditions concerning the use and occupancy of a dwelling unit

and premises, and also includes any terms required by law." Section 34–18–11(14).

It is undisputed that Cynthia's residence in the house was not governed by a rental agreement between the parties. Nor were plaintiffs her landlords; for better or for worse, Anthony Sr. was her father-in-law, and Audrey was her mother-in-law. In the trial justice's written decision on the issue of plaintiffs' attorney's fees, he addressed the applicability of the act, explaining that an implied rental agreement existed between plaintiffs and defendant. He further noted that "it is axiomatic that unless defendant was a tenant she would not have been entitled to any damages on her claim for unjust enrichment arising out of plaintiffs' claim relying on the Residential Landlord and Tenant Act." We do not agree with this reasoning.

We are convinced that there was no rental agreement between plaintiffs and defendant, implied or otherwise. To say that defendant was a party to this alleged "agreement" belies the meaning of the word.[5] Not only was there no meeting of the minds in this case, Anthony Sr.'s admissions defeat the argument that Cynthia was a tenant. Both Anthony Sr. and Audrey admitted that they never discussed the terms of "the kids'" residency in the house with Cynthia. Certainly, a rental agreement can arise from the parties' actions—for instance, if Anthony Jr. and Cynthia had sent monthly checks to plaintiffs and plaintiffs cashed them without complaint. *See Marshall Contractors, Inc. v. Brown University*, 692 A.2d 665 (R.I. 1997) (discussing implied-in-fact contracts); *cf.* § 34–18–16 (providing terms of an unsigned or undelivered rental agreement control if tenant pays and landlord accepts the agreed-upon rent). We have no such

---

**5.** Black's Law Dictionary defines "agreement" as a *"mutual* understanding between * * * [or] manifestation of *mutual* assent by two or more persons." Black's Law Dictionary 74 (8th ed.2004). (Emphases added.)

evidence before us from which such an agreement can be implied. Nor is there any proof of a landlord-tenant relationship between and among these parties. To the contrary, the evidence discloses that, based on plaintiffs' statements, Anthony Jr. and Cynthia treated the home as theirs, paying all expenses, including taxes and insurance.

 Given our determination that the Residential Landlord and Tenant Act did not apply to plaintiffs' claim, their award of attorney's fees must be vacated. "There is no general equitable right to attorney's fees in the absence of an authorizing statute or a contractual provision." *Jem Co. v. Fairway Capital Corp.*, 678 A.2d 1247, 1247 (R.I.1996) (mem.). Likewise, plaintiffs' award of $837.50 in litigation costs must be vacated, and defendant is entitled to reimbursement for the $105 paid to plaintiffs for costs associated with their District Court action. Because the basis for the awards of attorney's fees and litigation costs was the act, they cannot stand and are vacated.

## D

### Award of Rent

 Although we hold today that plaintiffs are not entitled to an award of rent under the Residential Landlord and Tenant Act, we are convinced that it is appropriate for defendant to reimburse plaintiffs for the fair rental value of her use of the dwelling from the point that plaintiffs demanded possession (July 2001) through the time of trial (November 2001), which amounts to $13,750. As the trial justice found, in light of Anthony Sr.'s representations to Cynthia, "[i]t would be inequitable and unjust to require an offset * * * for the rental up until the time that the term of the tenancy was in fact terminated." Requiring defendant to compen-sate plaintiffs for her use and occupation of the property after receiving notice to quit is appropriate in light of the facts in this case.

## E

### The Unjust Enrichment Award

The plaintiffs challenge the trial justice's finding that defendant was entitled to recover on her unjust enrichment counterclaim because she knew that plaintiffs owned the property. Alternatively, plaintiffs argue that the trial justice erred in calculating defendant's award by accepting Scotti's testimony about the house's appreciation attributable to the improvements, combining the cost of the improvements and the appreciation figure, and failing to offset defendant's recovery to account for the benefit she enjoyed by living in the house rent-free. We affirm the trial justice's grant of an unjust enrichment award to defendant but conclude that he erred in setting the amount of the award.

 Under Rhode Island law, unjust enrichment is not simply a remedy in contract and tort but can stand alone as a cause of action in its own right. *Toupin v. Laverdiere*, 729 A.2d 1286 (R.I.1999); Todd Barton, Note and Comment, *Filling in the Gaps in Civil Liability: The Development of Unjust Enrichment in Rhode Island*, 9 Roger Williams U.L.Rev. 695, 706–07 (2004). To recover for unjust enrichment, a claimant must prove: (1) that he or she conferred a benefit upon the party from whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient accepted the benefit under such circumstances "that it would be inequitable for [the recipient] to retain the benefit without paying the value thereof." *Bouchard v. Price*, 694 A.2d 670, 673 (R.I. 1997). It is undisputed that defendant conferred a benefit upon plaintiffs—a ben-

efit that plaintiffs realized by virtue of the improved condition of their property. This controversy concerns the third element: whether it would be inequitable for plaintiffs to retain the benefit without paying for it.

In *Eastern Motor Inns, Inc. v. Ricci*, 565 A.2d 1265, 1272 (R.I.1989), a prospective purchaser sought to recover under a theory of unjust enrichment for its expenditures in obtaining a zoning change for seller's property. The parties had executed a purchase and sales agreement, subject to a condition that the municipality approve the desired zoning change. *Id.* at 1267. The zoning change went into effect, but the parties failed to close the deal by the "dropdead date" set forth in the agreement. *Id.* at 1268–69. Because the value of the property had increased dramatically due to market conditions, the erstwhile purchaser alleged that the seller had been unjustly enriched because the property's appreciation was the result of the zoning change. *Id.* at 1268, 1272. We affirmed the trial justice's finding that the purchaser was not entitled to recover, holding that: "[w]hen a party makes improvements or confers a benefit upon the land of another with full knowledge that title is vested in another, or subject to dispute, the improver will not be entitled to restitution under the equitable doctrine of unjust enrichment." *Id.* at 1272. We concluded that the money expended by the purchaser was part of its ordinary cost of doing business and that the parties were engaged in an arms-length business transaction, fully aware of the attendant risks and obligations. *Id.* at 1273.

In this case, although the circumstances do not warrant conveyance of the house to defendant, it is quite another thing to allow plaintiffs to realize the bounty of her labors. Unlike the parties in *Eastern Motor Inns, Inc.*, plaintiffs and defendant were not parties to an arms-length transaction; this house was thought to be a wedding gift to the happy couple by the groom's parents. The improvement efforts were not merely business expenses. As the trial justice found, when defendant and her father made the improvements to the house, they were acting at Anthony Sr.'s behest, and Cynthia was operating under the reasonable belief (at the very least) that she and her husband were the equitable owners of the property. Therefore, the trial justice did not err in distinguishing this case from *Eastern Motor Inns, Inc.*, and finding for defendant on her unjust enrichment counterclaim.

■ We are convinced, however, that awarding defendant the appreciation in value attributable to her improvements to the house *and* the cost of those improvements was error. The benefit defendant conferred upon plaintiffs was an improved house; plaintiffs realized the difference between the fair market value of the house in its unimproved state and with the improvements, amounting to $106,000. We decline plaintiffs' invitation to second-guess the trial justice's decision to credit Scotti's testimony and reject Fahey's testimony. A trial justice, in his or her role as factfinder in a nonjury trial, is free to accept or reject all or part of an expert witness's testimony. *Cf. Morra v. Harrop*, 791 A.2d 472, 477 (R.I.2002) (holding juries are free to accept expert testimony in whole or in part). Adding the cost of improvements to the appreciation figure, however, would yield a double recovery.

■ We are satisfied that the trial justice did not err by dividing the unjust enrichment award in half or by refusing to offset the award to account for the defendant's use and occupancy of the property. It is axiomatic that a trial justice is in the best position to assess the credibility of witnesses and weigh the evidence. *State v. Vorgvongsa*, 670 A.2d 1250, 1257 (R.I.

1996). He determined that justice required only that the defendant receive compensation for half the total benefit conferred upon the plaintiffs, and the defendant has not provided us with any factual basis for her contention that she should receive it all. Similarly, the trial justice found that it would be "inequitable and unjust" to offset the defendant's unjust enrichment award by the rental value of the house up until the termination of her "tenancy." He based his finding on the defendant's reliance on Anthony Sr.'s braggadocio in repeatedly declaring his intention to give the house to "the kids" and his arrangement with Anthony Jr. that he and Cynthia live in the house rent-free.[6] Determining what constitutes a just or unjust result requires a trial justice to examine the facts of the particular case and balance the equities. *R & B Electric Co. v. Amco Construction Co.*, 471 A.2d 1351, 1356 (R.I.1984). Given his careful factual findings and credibility determinations, we are satisfied that the trial justice did not err in refusing to offset the defendant's award by an amount representing her use and occupancy of the premises prior to July 2001. Substantial justice between these parties was accomplished in this case.[7]

## V

## Conclusion

For the reasons set forth herein, we affirm in part and reverse in part. We vacate the judgment with respect to the plaintiff's award of attorney's fees and costs and the unjust enrichment award to the defendant and direct the entry of a new judgment. The defendant is entitled to recover one-half of the increased value of the house ($53,000), less use and occupancy of the property from July 1, 2001, through November 2001 at $2,750 per month ($13,750). In addition, the defendant shall be reimbursed for the amount she paid to the plaintiffs for litigation costs in the District Court ($105). We affirm the judgment in all other respects and remand the papers in the case to the Superior Court.

---

6. The plaintiffs cite J.E. Macy, Annotation, *Measure and Items of Recovery for Improvements Mistakenly Placed or Made on Land of Another*, 24 A.L.R.2d 11, § 18 at 51 (1952), for the proposition that recovery for improvements is "inseparably reciprocal" with the owner's right to recover for the improver's use and occupancy of the property. As the annotation goes on to say, however, "[i]f the occupancy of the property was with the consent of the owner, and with intention that it should be without compensation, the occupant may be found entitled to compensation for his improvements without deduction for rent * * *." *Id.* That is the situation confronting us in this case.

7. Following this same line of reasoning, we also are satisfied that the trial justice did not err in denying defendant's request for attorney's fees. *See Jem Co. v. Fairway Capital Corp.*, 678 A.2d 1247, 1247 (R.I.1996) (mem.) (holding attorney's fees generally not available unless authorized by statute or contract).