DECISION
This breach of contract action was tried to the Court without a jury. The following represents the Court's findings of fact and conclusions of law. Trial of this matter spanned several days. Jurisdiction is pursuant to G.L. 1956 § 8-2-13 and § 8-2-14.
 I Facts and Travel
Margaret Cardillo ("Margaret" or "Decedent") was a widow who died intestate on March 10, 2001. Her husband, Thomas C. Cardillo, predeceased her on July 28, 1998. On the date of her death, Decedent owned certain assets which became part of her probate estate. Said assets were to be distributed under the laws of intestacy to her next of kin, namely, her three adult children: Plaintiffs Tammi M. Branch (hereafter "Tammi") and Lori Cardillo-Kelsall (hereafter "Lori"), and Defendant Thomas C. Cardillo, Jr. (hereafter "Thomas"). Upon Margaret's death, Tammi filed a petition for probate in the Probate Court for the Town of Scituate and the Court appointed her as the Administratrix of the Estate.
On the date of her death, Decedent owned real property located at 12 Pinecrest Road, Scituate, Rhode Island (hereafter referred to as the "Scituate property"). At the time of her *Page 2 
death, Decedent had been residing there with her son Thomas, who suffers from multiple sclerosis. Thomas had lived with his mother for most of his life. Although no final order of distribution was entered by the Probate Court, in accordance with the laws of intestacy, the Scituate property was to be divided equally among Decedent's three children.
In addition to the Scituate property, Margaret owned or controlled other property at the time of her death, including:
 1) Real property located on West Side Road in the Town of Bartlett, New Hampshire (hereafter referred to as the "New Hampshire property"). She held this property in a joint tenancy with Thomas, with right of survivorship.
 2) A checking account at Citizens Bank owned jointly with Thomas, with right of survivorship (hereafter "the joint account").
 3) Death benefits from a life insurance policy issued by Transamerica Insurance and Investment Group in the amount of $125,000. The Decedent named each of her three children as equal beneficiaries under the policy. Accordingly, with the addition of interest, the insurance company paid $42,927.03 to each of Margaret's children after her death.
 4) An annuity, with death benefits, issued by AllAmerica Investments, Inc., in which Decedent named her three children to receive equal payments upon her death.
 5) A death benefit to each child in the amount of $1,333.33 from the Employees Retirement System of Rhode Island.
 6) Several motor vehicles. *Page 3 
According to the laws of intestacy, the only significant asset that was to pass through probate to the children was the Scituate property. The joint account, the New Hampshire property, the life insurance proceeds and the annuity proceeds all were to pass outside of probate, as follows: the New Hampshire property would pass to Thomas, as the surviving joint tenant; the joint account would pass to Thomas, as the surviving joint owner; and the life insurance and annuity benefits would pass to each child in equal amounts in accordance with Decedent's designation of beneficiaries.
The Plaintiffs allege, however, that the siblings attended several meetings at which they discussed and agreed to the details of an alleged agreement which provided that they pool all of the assets, probate and non-probate alike. According to this alleged agreement, the parties would use the pooled assets to pay all of the estate's debts, including Decedent's funeral costs, as well as bills incurred by her during her lifetime. Thereafter, the remainder allegedly would be divided and distributed to each of them in three equal shares.
The Plaintiffs testified that in order to carry out the intent of the agreement, the parties would deposit each child's share of the life insurance and annuity proceeds into a common account. That account, according to Plaintiffs, was to be used first to pay estate debts; thereafter, the remainder would be divided equally among the three children. According to the alleged agreement, the joint account, which would have passed in its entirety to Thomas, as joint owner, also was to be used to pay debts of the estate. According to Lori, she wrote checks on the account into which the insurance proceeds were deposited and which checks Thomas then signed. Lori further testified that she had to teach Thomas how to write a check. The Plaintiffs both testified that despite the fact that they each were entitled to receive one-third of the Scituate property under the laws of intestacy, they wanted Tom to own the property so he could continue *Page 4 
to reside there as he had done his entire life. At the time, however, the Scituate property was encumbered by two mortgages. Thomas testified that the bank had declared the second mortgage in default.
The Plaintiffs contend that according to the alleged agreement, the second mortgage on the Scituate property in the amount of approximately $49,000 would be discharged and paid in full with a portion of the pooled life insurance and/or annuity benefits.[1]
Thereafter, Thomas would assume the debt secured by the first mortgage and remain on the property.
The Plaintiffs further testified that in return for gaining sole ownership of the Scituate property, Thomas had agreed to convey to each of them a one-third interest in the New Hampshire property. They also testified that the parties had agreed to share the carrying costs associated with the New Hampshire property. Thomas, on the other hand, testified that at no time did he make an agreement with his sisters concerning the distribution of his mother's assets, and that their conveyance to him of their collective two-thirds' interest in the Scituate property was in accordance with his mother's wishes that he have sole ownership and possession of that property after she died.
It is undisputed that a portion of the pooled life insurance proceeds, as well as the joint account, were used to pay estate debts, and that insurance proceeds also were used to pay off the second mortgage on the Scituate property. Thereafter, the balance remaining in the pooled account was to be distributed in equal shares to Tammi, Lori and Thomas. It also is undisputed that the sisters signed a Purchase and Sale Agreement (PSA), and thereafter a Quitclaim Deed, each conveying to Thomas their inherited one-third interest in the Scituate property, thus leaving Thomas as the sole owner of that property. The PSA listed the purchase price as $74,000, with *Page 5 
$37,000 to go to each sister, and it represented that that purchase price had been "paid prior to the execution of this Agreement." The Purchase and Sale Agreement made no reference to the New Hampshire property or the alleged agreement as additional non-cash consideration for the sisters' conveyance. It is undisputed that Thomas, who now owns the Scituate property outright, assumed the first mortgage on the Scituate property and currently lives there with his wife, Terri.
The New Hampshire property, which had been used by Decedent and her entire family during her lifetime, passed to Thomas as the sole owner by reason of his being the surviving joint tenant. However, the siblings and their families continued to use the property as they had prior to Decedent's death. It is undisputed that the Plaintiffs paid certain utility and tax bills pertaining to the New Hampshire property. It also is undisputed that Thomas did not convey any ownership interest in the New Hampshire property to either of his sisters; indeed, he refused to sign a quitclaim deed that they presented to him well after the probate estate had been closed.
The Plaintiffs contend that Thomas has not honored his obligations under the alleged agreement by reason of his refusal to deed to each sister a one-third interest in the New Hampshire property in return for their both conveying their individual interests in the Scituate property, their contribution both toward payment of the second mortgage on the Scituate property, and payment of the utility bills on the New Hampshire property. Lori and Tammi believe that they honored their obligations under the alleged agreement with respect to the life insurance proceeds which were used, in part, to pay off the second mortgage on the Scituate property, and further that they conveyed to Thomas their respective one-third interests in the Scituate property, which they had inherited from Decedent.
Thomas testified, however, that he believed that the sisters' payment of tax and utility bills on the New Hampshire property was in exchange for their periodic use of the property with *Page 6 
their respective families. He denied that he ever agreed to convey any interest in the New Hampshire property to his sisters. He further testified that he actually refused to sign a quitclaim deed. He contended that he was not under any legal obligation to convey any ownership interest in the New Hampshire property to either sister.
The circumstances leading up to the alleged agreement to divideall of Decedent's former assets into three equal shares are disputed. The Court finds as factual that all three siblings attended several meetings at which the terms of the asset division were discussed. At least one of the meetings took place at the office of Steven DiGianfillipo, Esq., who was engaged to probate Decedent's estate and to represent Tammi in her capacity as Administratrix. An additional meeting occurred at the hospital at a time when the Decedent was terminally ill and certain end-of-life decisions had to be made by the family. At trial, no one testified precisely as to the terms of the alleged agreement. Furthermore, no written memorialization of any such agreement was made, despite the fact that portions of the alleged agreement involved the proposed conveyance of interests in real estate.
The Court further finds as fact that Tammi and Lori conveyed their inherited interests in the Scituate property to Thomas, recognizing that this property had been his home during his entire life, and because it was their desire for him to retain the property in accordance with their mother's wishes. They did not believe Thomas had the financial ability to pay off the second mortgage, as well as assume the first mortgage debt. Accordingly, the sisters, together with Thomas, deposited their life insurance proceeds from the Decedent's policy into a common fund which was undisputedly used to pay estate debts, and to pay off the second mortgage on Scituate.
Attorney DiGianfillipo advised the three children that the estate was closed after the sisters conveyed their interest in the Scituate property to Thomas, and the attorney prepared a *Page 7 
certificate of completion which was signed by Tammi as Administratrix. The attorney further prepared a release to be signed by each of the Decedent's children, evidencing their acknowledgment of completed administration, and the release of any claims each may have against the estate. The releases were signed by Tammi, Lori and Thomas.
Thomas continues to be the sole owner of the New Hampshire property, and no attempt has ever been made by Thomas to convey portions of his interest in that property to his sisters. I find as fact, however, that Tammi and Lori paid some of the expenses associated with that property, and that such payment was in recognition of Thomas' willingness, despite his sole ownership, to allow his sisters and their families to use that property periodically as they had during the time Margaret was alive.
Additional facts will be supplied as needed in the Analysis portion of this Decision.
 II Analysis
The Plaintiffs assert that the parties formed an agreement prior to Decedent's death concerning the distribution of all her assets, both estate and non-estate, and that the agreement constituted a valid, legally enforceable contract. They further maintain that even if the agreement did not constitute an express contract, the equitable principles of quasi-contract, as well as the doctrines of unjust enrichment or promissory estoppel, obligate Thomas to pay them funds necessary to equalize the distribution of both estate and non-estate assets under the agreement. An accountant, David P. Krekorian, in fact testified as to what transfers of cash and property had to be made, in his opinion, to realize what he understood to be the intent of the contract. Mr. Krekorian, however, provided no testimony and presumably had no direct personal *Page 8 
knowledge relative to the existence of such an agreement. Instead, he prepared his distribution scenario on the assumption that such an agreement existed.
 1. The Existence of a Contract
It is axiomatic that "[c]ontracts for testamentary disposition are allowed to stand only when established by clear proof."Filippi v. Filippi, 818 A.2d 608, 623 (R.I. 2003). Furthermore, "to prove the existence of a contract, [the party] must prove each element of a valid contract by clear and convincing evidence." Id. To prove those elements, the following must be demonstrated:
 "[e]very contract must be formed through mutual assent or, in other words, an intention to promise or be bound through offer and acceptance. [I]t is a party's objective intent that will be considered as creating either an offer or acceptance. Objective intent is determined by the external interpretation of the party's or parties' intent as manifested by action. In addition to mutual assent, a bilateral contract requires mutuality of obligation, which is achieved when both parties are bound legally by the making of reciprocal promises. Mutuality of obligation fulfills the consideration requirement of contracts. To determine consideration, the Restatement (Second) of Contracts § 71 (1981) employs a bargained-for exchange test. Under this test, something is bargained-for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." Filippi, 818 A.2d. at 623-24 (internal citations and quotations omitted).
Thus, to be an enforceable contract, "there must be an offer and an acceptance[,] [and] manifest an objective intent [by the parties] to be bound by the agreement." Opella v. Opella,896 A.2d 714, 720 (R.I. 2006).
In the instant matter, it is undisputed that there existed no signed written agreement between the parties. However, Plaintiffs maintain that there existed an implied-in-fact contract. *Page 9 
It is axiomatic that,
 "an implied contract in the proper sense arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract." Bailey v. West, 105 R.I. 61, 64, 249 A.2d 414, 416 (1969).
In order to prove the existence of an implied-in-fact contract, Plaintiffs must establish the necessary elements. Accordingly,
 "It has been said that a contract implied in fact must contain all the elements of an express contract. So, such a contract is dependent on mutual agreement or consent, and on the intention of the parties: and a meeting of the minds is required. A contract implied in fact is for every intent and purpose an agreement between the parties, and it cannot be found to exist unless a contract status is shown. Such a contract does not arise out of an implied legal duty or obligation, but out of facts from which consent may be inferred; there must be a manifestation of assent arising wholly or in part from acts other than words, and a contract cannot be implied in fact where the facts are inconsistent with its existence." Id.
A unilateral mistake in forming a contract will not provide the mistaken party with relief. See Merrimack Mut. FireIns. Co. v. Dufault, 958 A.2d 620, 625-626 (R.I. 2008) ("A party to a contract who labors under a mistake uncommon to the other side will not be afforded relief.") (citing McEntee v. Davis,861 A.2d 459, 463 (R.I. 2004)).
Furthermore, the "essential elements of contracts `implied in fact' are mutual agreement and intent to promise, but the agreement and the promise have not been made in words and are implied from the facts." Id. at 64-65, 249 A.2d at 416. However, regardless of whether a contract is express or implied, "a litigant must prove mutual assent or a `meeting of the minds between the parties.'"Opella, 896 A.2d at 720 (quoting Mills v. Rhode IslandHospital, 828 A.2d 526, 528 (R.I. 2003) (mem.)). Determining whether there existed a "meeting of the minds" *Page 10 
requires the Court to assess witness credibility and to weigh the evidence. See Soares v. Langlois,934 A.2d 806, 809 (R.I. 2007).
As already noted, it is undisputed that there exists no written express contract between the parties. Consequently, the Court must assess the credibility of the witnesses and the weight of the evidence in order to determine whether there was a meeting of the minds such that a contract may be implied-in-fact.
Having conducted that assessment, the Court finds the testimony of Thomas more credible than that of his siblings, Tammi and Lori, on the issue of whether the alleged agreement actually was formed. Thomas testified that he was present when there were discussions concerning the distribution of his mother's assets — probate and non-probate alike. Although Tammi testified that she went over the details with Thomas approximately twenty to thirty times, the Court finds that Thomas credibly testified that he did not understand much of what was discussed by his sisters, and that he did not agree to convey two-thirds of the New Hampshire property to them in return for obtaining sole ownership of the Scituate property. Thomas further credibly testified that Tammi told him to pay the bills of the estate with the joint account, and that Lori wrote the necessary checks for him to sign. Thomas's lack of understanding of the financial dealings is buttressed by Attorney DiGianfillipo's credible testimony that Thomas remained mostly silent during the course of the meetings and did not participate in the discussions.[2]
Thus, while the Court finds credible that there were discussions about the distribution of all of Margaret's assets, the Court cannot conclude that a meeting of the minds ever took place regarding the alleged agreement. Consequently, even though Tammi and Lori may have *Page 11 
believed that they reached an agreement with Thomas regarding disposition of all of the assets, such beliefs are not supported by the weight of the evidence. In view of the Court's conclusion that a meeting of the minds did not take place, the Court further concludes that an implied-in-fact contract was never formed.
 2. Statute of Frauds
Even assuming that there had existed an implied-in-fact contract, there is a question as to the validity and enforceability of such a contract under chapter 1 of title 9, entitled "Statute of Frauds." That statute, adopted from English common law, requires evidence of a written agreement in all transactions involving the sale of land.
It is well settled that the Statute of Frauds, "must be strictly construed and strictly applied. . . ." Brochu v. Santis,939 A.2d 449, 453 (R.I. 2008). It provides in pertinent part:
 "No action shall be brought: (1) Whereby to charge any person upon any contract for the sale of lands, tenements, or hereditaments . . . unless the promise or agreement upon which the action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him or her thereunto lawfully authorized." Section 9-1-4.
Thus, "a contract for the sale of land need not be in writing to satisfy the statute of frauds as long as there is a [signed] memorandum that contains `the substance of the contract or agreement,' but need not include all of the particulars."731 Airport Associates v. H M Realty Associates, LLC exrel., 799 A.2d 279, 284 (R.I. 2002) (quoting Greensleeves,Inc. v. Smiley, 694 A.2d 714, 716 (R.I. 1997)). However, before a court may award specific performance of a real estate contract, "the essential terms of the contract must be clear, definite, certain, and complete." 71 Am. Jur. 2d Specific Performance § 34 (2001);see also St. Lawrence v. Reed,74 R.I. 353, 356-57, 60 A.2d 734, 735-36 (1948) *Page 12 
(upholding denial of specific performance where the terms of the agreements "were general, indefinite and uncertain and left important matters of detail to conjecture or to be supplied by the court").
In order to enforce a written memorandum of agreement under the Statute of Frauds, said memorandum must contain the following terms and be signed by the person against whom enforcement is sought:
 "if it sets out who are the seller and the buyer, their respective intention to sell and to purchase, such a description of the subject matter of the sale as may be applied to a particular piece of land, the purchase price, and the terms of payment if the sale is not for cash.'" Caito v. Juarez, 795 A.2d 533, 536 (R.I. 2002) (quoting Greensleeves, Inc, 694 A.2d at 716) (emphasis in the original).
In the instant matter, it is undisputed that no written agreement was made concerning the alleged agreement between the siblings, nor does any memorandum of agreement exist meeting the aforementioned criteria. Consequently, it appears that even if an oral agreement existed, any portion involving the conveyance of an interest in real estate would be unenforceable under the Statute of Frauds.
There is, however, an exception to the statute — it is the doctrine of part performance. See Richard v. Richard,900 A.2d 1170, 1175 (R.I. 2006). Under that doctrine, "[w]hen a party seeking enforcement of an oral contract `has performed to such an extent that repudiation of the contract would lead to an unjust or fraudulent result, the court will disregard the requirement of a writing and enforce an oral agreement.'" Id. (quotingR.W.P. Concessions, Inc. v. Rhode Island Zoological Society,487 A.2d 129, 131 (R.I. 1985)). Thus,
 "A court generally will enforce an alleged oral contract pursuant to the doctrine of part performance only if a party can adequately demonstrate, in reliance on said agreement, possession of the property, improvements thereon, or payment of a substantial part of the purchase price. Pearl Brewing Co. v. McNaboe, 495 A.2d 238, 242 (R.I. 1985) *Page 13 
("[t]aking possession of property . . . together with making improvements or paying a substantial part of the purchase price, is generally sufficient to avoid the bar of the statute of frauds"); R.W.P. Concessions, Inc., 487 A.2d at 131 ("the terms of the agreement must be clear and the possession or improvements in reliance thereon must be substantial and clearly shown"). "[P]art payment of the purchase price, possession or making improvements severally might not be sufficient to remove the case, yet a combination of all may be." Najarian v. Boyajian, 48 R.I. 213, 215, 136 A. 767, 768 (1927). We note, however, that the statute of frauds is not to be taken lightly, and any partial performance must unequivocally indicate the existence of the purported oral agreement. See Messner Vetere Berger McNamee Schmetterer Euro RSCG, Inc. v. Aegis Group PLC, 93 N.Y.2d 229, 689 N.Y.S.2d 674, 711 N.E.2d 953, 956 (1999) ("Part performance alone, of course, is not sufficient. The performance must be unequivocally referable to the agreement."); 4 Corbin on Contracts (Statute of Frauds) § 18.11 (rev. ed. 1997)." Richard, 900 A.2d at 1175.
In the present case, Plaintiffs failed to prove that there was a meeting of the minds and that a valid agreement had been formed. Without the existence of an agreement, the bar of the statute of frauds cannot be overcome under the doctrine of partial performance. Consequently, the Court declines Plaintiffs' invitation to invoke the doctrine of part performance in order to avoid the requirements of writing set forth in the Statute of Frauds.
 3. Promissory Estoppel
Plaintiffs also seek to invoke the doctrine of promissory estoppel to enforce the alleged oral agreement.[3] However, this argument also must fail for the same reason that *Page 14 
part performance is unavailable; namely, Plaintiffs failed to prove that there was a meeting of the minds such that an actual promise existed.
Promissory estoppel consists of "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance, [and therefore] is binding if injustice can be avoided only by enforcement of the promise." Filippi,818 A.2d at 625 (quoting Alix v. Alix,497 A.2d 18, 21 (R.I. 1985)). However, "[a] successful promissory estoppel action must include a clear and unambiguous promise."Id.
The establishment of promissory estoppel requires that there be: "1. A clear and unambiguous promise; 2. Reasonable and justifiable reliance upon the promise; and 3. Detriment to the promisee, caused by his or her reliance on the promise." Id. at 626. InFilippi, the Court stated that "[w]here an oral agreement . . . [to make a will] rests on parol evidence, it must be established by clear, satisfactory and convincing evidence."Id. at 627. The reason for this is because "[s]uch a contract is to be looked upon with suspicion and can only be sustained when established by the clearest and strongest evidence, and suchevidence must be so clear and forcible as to leave no reasonabledoubt of its terms or character." Id. (Emphasis added.) Like the instant matter, the Filippi Court concluded that Plaintiffs "failed to establish not only the *Page 15 
terms of the contract but also its mere existence."Id. at 627. In that case, as here, there was a failure to prove a clear and unambiguous promise such that there could have been no justifiable reliance upon a promise.
Such a conclusion does not mean necessarily that Plaintiffs have no avenue for recovery. It is apparent to the Court that while no meeting of the minds occurred, and no agreement was reached, Plaintiffs may still be entitled to recovery under a theory of unjust enrichment.
 4. Unjust Enrichment
Plaintiffs maintain that Thomas was unjustly enriched when the second mortgage on what became his property was satisfied with non-probate insurance proceeds that were paid from the joint account, a portion of which was the life insurance proceeds paid to the plaintiff sisters.[4] They assert that Thomas should be ordered to repay that portion of the proceeds that they had contributed towards payment of the mortgage.[5]
It is well settled that "[u]nder Rhode Island law, unjust enrichment is not simply a remedy in contract and tort but can stand alone as a cause of action in its own right." Dellagrotta v.Dellagrotta, 873 A.2d 101, 113 (R.I. 2005). Additionally, "even in the absence of a[] [legally] enforceable contract, the equitable doctrine of unjust enrichment may apply under certain circumstances to prevent a person from retaining a benefit received from another without appropriate payment for same." Doe v. Burkland,808 A.2d 1090, 1095 (R.I. 2002). *Page 16 
Furthermore, the duty to compensate in situations of unjust enrichment "arises, not from consent of the parties, as in the case of contracts, express or implied in fact, but from the law of natural immutable justice and equity." Hurdis Realty,Inc. v. Town of N. Providence,121 R.I. 275, 278, 397 A.2d 896, 897 (1979).
To recover under a theory of unjust enrichment, "a claimant must prove: (1) that he or she conferred a benefit upon the party from whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient accepted the benefit under such circumstances `that it would be inequitable for [the recipient] to retain the benefit without paying the value thereof.'" Id.
(citing Bouchard v. Price, 694 A.2d 670, 673 (R.I. 1997)). Of these elements, "[t]he most significant . . . is that the enrichment to the defendant be unjust." R B Elec. Co. v. AmcoConstr. Co., 471 A.2d 1351, 1356 (R.I. 1984).
In Eastern Motor Inns, Inc. v. Ricci,565 A.2d 1265, 1272 (R.I. 1989), our Supreme Court held that a purchaser is not entitled to restitution under the doctrine of unjust enrichment "[w]hen [the] party makes improvements or confers a benefit upon the land of another with full knowledge that title is vested in another, or subject to dispute. . . ." The reasoning behind this conclusion was "that the money expended by the purchaser was part of its ordinary cost of doing business and that the parties were engaged in an arms-length business transaction, fully aware of the attendant risks and obligations." Dellagrotta,873 A.2d at 114.
Dellagrotta involved the purchase of a home by defendant's prospective in-laws. Although the in-law/plaintiffs retained title to the house, the alleged intention was to gift it to the newlyweds. The couple made substantial improvements to the property after they took possession. When defendant's marriage broke down, plaintiffs filed an action for possession and sought damages in the Rhode Island District Court. The defendant filed three counterclaims, one *Page 17 
of which sought title and monetary damages under the theory of unjust enrichment. The counterclaims were dismissed and judgment entered in favor of the plaintiffs. On appeal, a Superior Court Justice found that defendant was entitled to recover the value of the improvements because "`she reasonably believed that the property was intended to be hers.'" Id. at 107. The Supreme Court affirmed the finding, holding that "although the circumstances do not warrant conveyance of the house to defendant, it is quite another thing to allow plaintiffs to realize the bounty of her labors." Id. at 114. The Court distinguished Eastern MotorInns, Inc., stating,
 "Unlike the parties in Eastern Motor Inns, Inc., plaintiffs and defendant were not parties to an arms-length transaction; this house was thought to be a wedding gift to the happy couple by the groom's parents. The improvement efforts were not merely business expenses. As the trial justice found, when defendant and her father made the improvements to the house, they were acting at [plaintiff father-in-law's] behest, and Cynthia was operating under the reasonable belief (at the very least) that she and her husband were the equitable owners of the property. Therefore, the trial justice did not err in distinguishing this case from Eastern Motor Inns, Inc., and finding for defendant on her unjust enrichment counterclaim." Id.
In the instant matter, it is clear that Plaintiffs conferred a benefit upon Thomas through their contribution towards payment of the second mortgage. The issue that remains is whether it would be inequitable for Thomas to retain that benefit to his property without paying for it.
The record evidence reveals that numerous discussions occurred concerning disposition of Decedent's probate and non-probate assets. As a result of those discussions, at the time, Plaintiffs genuinely believed that an agreement had been reached to equally divide all of the assets, probate and non-probate alike, among the three siblings. However, that belief was unfounded because no meeting of the minds had taken place. *Page 18 
Thomas credibly testified that the second mortgage on the Scituate property had been in default. In accordance with their misplaced belief that the agreement had been reached, Tammi and Lori contributed towards the payment of the second mortgage and conveyed their interest in the property to Thomas subject only to the first mortgage. The Court finds that this was not an arm's-length transaction. The Court concludes that Plaintiffs' actions were based upon their mistaken belief that an agreement had been formed and that it would be inequitable for Thomas to retain the benefit of that mistake without paying for it.
 III Conclusion
In light of the foregoing, the Court concludes that Plaintiffs did not prove the existence of a valid contract. Furthermore, even if an oral contract had been formed, recovery would have been precluded under the Statute of Frauds. Also, because there was no meeting of the minds, recovery under the doctrine of promissory estoppel is not available. However, the Court further concludes that Thomas was unjustly enriched by Plaintiffs' contribution towards payment of the second mortgage and orders Thomas to return to each sister their proportionate share of that contribution.
Judgment shall enter for each of the plaintiffs in the amount of $16,254.66.
[1] The actual amount of the second mortgage was $48,763.98. Each sibling contributed $16,254.66 from their proportionate share of the pooled insurance funds to pay that mortgage.
[2] The fact that Thomas did not even know how to write a check until taught by Lori also supports an inference that he lacked financial acumen.
[3] The Complaint sought monetary damages for breach of contract and did not invoke promissory estoppel as a theory for recovery. However, during the trial, Plaintiffs made an oral Motion to Amend the Complaint to Conform to the Evidence pursuant to Rule 15(b) of the Superior Court Rules of Civil Procedure. That Rule provides:
 "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the objecting party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence." Super. R. Civ. P. Rule 15(b).
Rule 15(b) is a liberal rule. Kenney v. Providence Gas Co.,118 R.I. 134, 143, 372 A.2d 510, 514 (R.I. 1977) ("It is well-established that proposed amendments under Rule 15(b) are allowed with the greatest liberality."). Thus, "[a]bsent a showing of extreme prejudice, a trial justice should permit the proposed amendment and allow the evidence."Id. at 142, 372 A.2d at 514.
During the course of the trial, Plaintiffs introduced evidence that, if found persuasive, would support a claim for promissory estoppel. The Court concludes that Thomas suffered no prejudice from the introduction of said evidence; consequently, the Motion to Amend the Complaint to Conform to the Evidence is granted.
[4] Thomas asserts in his post-trial memorandum that the Court lacks subject matter jurisdiction insofar as the action relates to Margaret's probate assets and that the proper venue to challenge distribution of the estate was in the probate court. He contends that Plaintiffs' failure to properly and timely appeal from that Court precludes the instant action. However, the funds used to pay the second mortgage were not part of the probate estate and the current action involves breach of an alleged agreement that was outside of the probate proceedings. Consequently, the Court has jurisdiction to consider the matter.
[5] Like the promissory estoppel claim, unjust enrichment was not pleaded specifically. However, the Court finds that Plaintiffs also produced enough evidence to support such a claim and also permits an amendment of the complaint to conform to that evidence. *Page 1