YI GU

v.

**RHODE ISLAND PUBLIC TRANSIT
AUTHORITY et al.**

**No. 2010–73–Appeal.**

Supreme Court of Rhode Island.

March 5, 2012.

Nicholas Trott Long, Esq., Providence, for Plaintiff.

James E. Kelleher, Esq., Warwick, for Defendants.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on November 29, 2011, after a jury verdict in favor of the defendants, Rhode Island Public Transit Authority (RIPTA) and Edmund E. Hathaway (Hathaway) (collectively, defendants). The plaintiff, Yi Gu (plaintiff or Yi Gu), appeals from the trial justice's denial of her motions for a new trial and for reconsideration of that decision. The plaintiff argues that the trial justice erred by failing to grant her motion for a new trial based on the weight of the evidence; plaintiff further argues that the trial justice erred by failing to reconsider her decision based on errors that plaintiff contends occurred during a jury view of the scene of the collision that gave rise to the underlying complaint.

Because we are of the opinion that plaintiff's motion for a new trial should have been granted due to errors that occurred in the conduct of the jury view, we need not pass upon the sufficiency of the evidence. We vacate the judgment of the Superior Court and remand the case.

## Facts and Travel

On March 2, 2005, a RIPTA bus driven by Hathaway, a long-time RIPTA driver, struck plaintiff while she was crossing the street at the intersection of Waterman Street and North Main Street, at the entrance to what is commonly referred to as the "East Side bus tunnel" (bus tunnel) in Providence.[1] The plaintiff, who at the time of the accident was a twenty-seven-year-old graduate student from China studying at Brown University, brought suit against RIPTA and Hathaway for injuries arising from Hathaway's alleged negligence. Yi Gu additionally sued Hathaway for gross negligence, alleging that he improperly delayed moving the bus off her leg, leaving her trapped under the wheel. A six-day jury trial commenced in October 2009.

At trial, plaintiff asserted that she began to cross the street after she pressed the signal override button and after she waited for the "walk" signal; she added that she was "ultra careful" to remain in the crosswalk when traversing the intersection. The plaintiff testified that she looked left before crossing the street, and that she never saw the bus coming toward her.[2] The plaintiff recounted that she was approximately half-way across the street when she "felt something was pushing me from behind on my left" and realized that it was a large vehicle. She testified that "the push was too powerful to escape so I was knocked down" and that her right ankle was trapped under the bus's tire. As a result of the accident, plaintiff underwent numerous surgeries and extensive physical therapy, and she was forced to interrupt her studies, resulting in a one-year delay to her graduation from Brown University.[3]

Also testifying at trial was William Drew (Professor Drew), a professor at the Rhode Island School of Design (RISD) and a bystander who came to plaintiff's aid at the scene of the accident. Professor Drew had disembarked from the bus just before it hit plaintiff; although he did not see plaintiff before the collision, he did hear her yell and saw her on the ground and under the tire after the collision. Professor Drew testified that he banged on the side of the bus and shouted for it to stop. He then cradled plaintiff's head and comforted her until an ambulance arrived. Professor Drew testified that plaintiff told him at the scene that "the light was green," although other evidence produced at trial indicated that plaintiff was actually referring to the white walk signal.[4] Professor Drew also testified that he twice

---

1. The intersection in question is unique; North Main Street is a one-way northbound thoroughfare, on which, from the perspective of a bus exiting the bus tunnel onto North Main Street, traffic runs from left to right. The bus tunnel exit is located just before the intersection of North Main and Waterman Streets. The plaintiff was struck on her left side by Hathaway's bus as it was making a right turn from the bus tunnel onto North Main Street, as plaintiff was crossing North Main Street. There is a crosswalk in this location.

2. The plaintiff also testified that she had a clear line of vision and was not wearing the hood of her coat.

3. The plaintiff eventually graduated from Brown University and currently is employed by the University of Toronto as a professor. It is undisputed that the accident caused plaintiff to lose one year's salary as a professor, equal to $78,997.10. The plaintiff testified that she still suffers persistent pain from the injuries she sustained as a result of the accident and that the accident has impacted her personal and professional life.

4. The plaintiff testified that she was in a state of shock and confusion immediately after the accident, which led her to confuse the white walk signal with walk signals in China, which are green.

told the bus driver to move the bus off plaintiff's leg and that the driver did not comply until an unidentified off-duty police officer told him to do so. It is unclear how long the bus tire remained on plaintiff's injured leg.

The plaintiff presented two additional eyewitnesses at trial. Catherine Hamilton (Hamilton), an artist, who saw the accident from her studio window, testified that she saw the bus "clip[ ]" plaintiff when plaintiff was about one-third of the way across the street. She further stated that plaintiff did not stray outside of the crosswalk. John Silva (Silva), a RISD employee who witnessed the accident while sitting in his parked vehicle, testified that he saw the front-passenger side of the bus strike the left side of plaintiff's body. Silva testified that he was unsure whether plaintiff was in the crosswalk when the bus struck her.[5] Silva also testified that he believed that plaintiff was wearing her hood.

Two witnesses testified for the defense. Hathaway testified that he is very familiar with the area where the accident occurred and that, when exiting the bus tunnel, he never turns right on red. Hathaway maintained that he did not see plaintiff in the crosswalk and that he maneuvered the bus into the intersection after waiting for the traffic light to turn green and after he looked both ways. Hathaway also described how the mechanism that governs the traffic lights at the intersection functions such that a bus exiting the tunnel cannot have a green light at the same time a pedestrian has a walk signal. According to Hathaway, when the "walk" signal is illuminated, the bus has a red light and,

correspondingly, when the traffic light is green, the walk signal is not illuminated.

Daniel Bannister (Bannister), a RIPTA employee, also testified for defendants. Although Bannister did not see the collision, he described how at the time of the accident, he was driving through the bus tunnel in a RIPTA vehicle behind Hathaway's bus; he testified that the traffic light was green when Hathaway's bus turned into the intersection.

At the close of evidence, but before final arguments, the jurors walked about two blocks from the courthouse to the intersection where the accident occurred to view both the accident scene and Hamilton's studio.[6] Prior to the view, one juror—while in the courtroom and on the record—expressed to the trial justice that "it is very important for me to see the bus coming out of the tunnel to see the angle at which it turned. I would like to have the opportunity." Although the trial justice responded that she would "talk to the attorneys about it," there is no record of any corresponding discussion between the trial justice and counsel. In response to another juror's question, the trial justice told the jurors that the view was intended to "give you context;" however, the trial justice did not instruct the jurors that the view was not evidence, nor did she explain at that point that they could not consider the view as evidence during their deliberations.

The trial justice and the attorneys accompanied the jurors to the accident scene where the jurors were allowed to cross the street, walk about the intersection unes-

---

5. On cross-examination, however, Silva was impeached with a statement that he had made twenty-eight days after the accident, in which he stated that plaintiff was between one and three feet outside of the crosswalk when he first saw her and that she did not look left when crossing the street.

6. Before the start of trial, plaintiff moved for a jury view of the scene of the collision, but the trial justice refused to rule on the motion and reserved her decision until later in the trial, after the close of the evidence.

corted, and operate the walk signal buttons. None of the discussions or events that occurred during the view were transcribed or otherwise reflected in the record. Based on our review of the record of the posttrial proceedings, however, it can be concluded that during the view one or more jurors communicated a desire to see how the traffic light functioned, particularly in conjunction with a trip bar located at the end of the bus tunnel.[7] Apparently, during the view, some of the jurors had noticed that the traffic light for the vehicles exiting the bus tunnel never changed from red to green. In her ruling on plaintiff's posttrial motion, the trial justice stated that the jurors had questioned why the tunnel light never turned green. They learned—possibly through the trial justice's questioning of a RIPTA employee—that the light changed only when a mechanism characterized as a trip bar, located at the bus tunnel's exit, is activated. It appears that, because RIPTA had suspended the movement of its buses through the tunnel during the view,[8] the trip bar never activated. Several jurors attempted to activate the bar themselves by standing on it. However, their weight proved insufficient to trigger the mechanism, and so—apparently unbeknownst to plaintiff's counsel—a RIPTA vehicle was brought to the tunnel in order for a demonstration to occur.

A demonstration of the trip bar ensued—seemingly at the behest of the trial justice—involving a RIPTA van, driven by a RIPTA employee, that was moved to the bus tunnel exit, thereby activating the trip bar. The demonstration revealed how the trip bar controls the traffic lights; it showed that when the bar is triggered by a vehicle exiting the tunnel, the traffic light at the tunnel exit turns green, permitting a right turn, and the pedestrian signal correspondingly changes to "don't walk." When the trial resumed two days later, during her final instructions to the jury, the trial justice instructed the jury that "[t]he view itself isn't evidence."

The jury returned a verdict for defendants, and plaintiff filed a motion for a new trial, alleging that the jury verdict was against the weight of the evidence.[9] Specifically, plaintiff argued that Hathaway's testimony was not credible, and that irrespective of Hathaway's credibility, the bus driver had a duty to avoid hitting a pedestrian. The first of three hearings concerning plaintiff's motion for a new trial was held on November 20, 2009. The trial justice, acting as the "seventh juror," declared that she found plaintiff to be a credible witness, and that her testimony was corroborated by Hamilton and Drew. The trial justice further stated that she found Hathaway's testimony lacking in credibility. Based on the evidence introduced at trial, she determined that Hathaway's testimony that before he turned the bus onto North Main Street, he looked and saw no pedestrians in his way, "[o]bviously * * * wasn't true," and that "[p]lainly, plaintiff was in the intersection when he made his turn * * *."

However, based on her observations during the view and the trip bar demonstration, the trial justice concluded that the traffic lights could change fast enough "to catch a pedestrian who is crossing the street off guard." The trial justice found that the demonstration conducted during the view "clarified things." As to her in-

7. No evidence concerning the existence of a trip bar had been introduced at trial.

8. This apparently was done at defendant's request and with the trial justice's approval.

9. The jury was instructed on comparative negligence, but because the jury returned a verdict finding that defendant was not negligent, that issue is not before us.

structions to the jury that the view was not evidence, the trial justice recalled:

> "The only part of the jury charge that gives me pause is that moment during which I informed the jury that a view is not evidence. Ordinarily, that is a correct instruction. But, here, in this case, the jury saw a demonstration during the view. That took the view out of the general purpose for which a view is offered; that is, for the purpose of giving context. I remember distinctly from when I was charging the jury that each of them looked startled when I told them that the view was not evidence. That's why I * * * hesitated * * *. Their reaction caught me off guard. They probably should have been instructed that they could consider the facts learned from the demonstration [of the RIPTA van and the trip bar] as evidence. However, even had the jury been so instructed, it wouldn't have made any difference to [me as the seventh juror]."

The trial justice ultimately concluded that a different jury instruction regarding the view "wouldn't have made any difference to [her]" and that, while there was evidence of Hathaway's negligence, it was not dispositive. The trial justice accordingly denied plaintiff's motion for a new trial.

Subsequently, plaintiff asked the trial justice to reconsider her ruling. Yi Gu challenged the legitimacy of the view evidence, asserting that it constituted error for the trial justice to allow the trip bar demonstration and to communicate *ex parte* with jurors and the RIPTA employee who facilitated the demonstration. The plaintiff further contended that the demon-

stration was prejudicial because it involved a van and not a bus, and because it allowed RIPTA an unfair opportunity to interact with the jury through its employee who performed the demonstration. Significantly, plaintiff asserted that only upon hearing the trial justice's remarks during the hearing on plaintiff's new-trial motion did counsel learn that a demonstration had been conducted during the view.[10]

A hearing on plaintiff's motion for reconsideration was held on December 17, 2009, at which time plaintiff argued that no evidence about the trip bar was introduced at trial and that the demonstration by RIPTA personnel constituted evidence that erroneously was brought to the attention of the jury. The plaintiff further averred that it was not until the hearing on plaintiff's motion for a new trial that counsel discovered that evidence had been produced during the view. A dispute thereupon developed between plaintiff's attorneys and the trial justice concerning where counsel was standing during the view and whether plaintiff's attorneys knew that a demonstration was about to occur.[11] The trial justice declared that plaintiff's attorneys should have been aware of the demonstration, and she noted that plaintiff's attorneys failed to object when the van was moved to the trip bar, and that they never asked for a cautionary instruction. The trial justice, noting that the jurors had been instructed not to consider the view as evidence, denied plaintiff's motion.

Significantly, when the parties appeared for a hearing on the entry of judgment, the trial justice acknowledged that "plaintiff's counsel may have been unaware of events that took place during [the] view." The

---

10. We note that in their closing statements, neither party referenced the demonstration that had occurred during the view.

11. It also appears, based on the trial justice's comment that the jurors were dispersed "all over the intersection" during the view, that some of the jurors may have been across the street when the demonstration occurred.

trial justice nonetheless concluded that she would not revisit her ruling on the motion for a new trial, and, citing *Clemente v. Carnicon–Puerto Rico Management Associates, L.C.*, 52 F.3d 383 (1st Cir.1995), the trial justice concluded that plaintiff's counsel bore the burden to "lodge a formal objection" to the view in a timely fashion, or risk foreclosure of the issue.[12]

On appeal, plaintiff argues that the trial justice erroneously denied her motion for a new trial because the weight of the evidence required a verdict in her favor. The plaintiff also contends that the trial justice erred by not granting the motion based on plaintiff's contention that the demonstration that occurred during the view was improper and prejudicial to plaintiff's case.

### Standard of Review

It is well-settled that "[a] trial justice's role in considering a motion for a new trial is that of a superjuror, who must weigh the evidence and assess the credibility of the witnesses." *Pollard v. Hastings*, 862 A.2d 770, 777 (R.I.2004) (citing *Oliveira v. Jacobson*, 846 A.2d 822, 826 (R.I. 2004)). In conducting his or her independent review of the evidence, the trial justice "can reject some evidence and draw inferences which are reasonable in view of the testimony and evidence in the record." *Ruggieri v. Big G Supermarkets, Inc.*, 114 R.I. 211, 216, 330 A.2d 810, 812 (1975). "If the trial justice determines that the evidence is evenly balanced or is such that reasonable minds in considering the same evidence could come to different conclusions, the trial justice must allow the verdict to stand." *Botelho v. Caster's, Inc.*, 970 A.2d 541, 545 (R.I.2009) (citing *Mar-*

*cotte v. Harrison*, 443 A.2d 1225, 1232 (R.I.1982)).

When reviewing a trial justice's decision to deny a motion for a new trial, if we are satisfied that "the trial justice has carried out the duties required by Rule 59 of the Superior Court Rules of Civil Procedure and our decided cases, his or her decision is accorded great weight by this Court * * *." *Botelho*, 970 A.2d at 546. The decision cannot stand, however, if it can be shown that "the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." *Izen v. Winoker*, 589 A.2d 824, 829 (R.I.1991) (citing *Lariviere v. Dayton Safety Ladder Co.*, 525 A.2d 892, 900 (R.I. 1987)).

With respect to a motion to reconsider the ruling, "[t]he Superior Court Rules of Civil Procedure, similar to the Federal Rules of Civil Procedure, do not provide for a motion to reconsider." *School Committee of Cranston v. Bergin–Andrews*, 984 A.2d 629, 649 (R.I.2009). Nonetheless, although they are not favored, "we have allowed 'motions to reconsider' to be treated as motions to vacate under Rule 60(b) of the Superior Court Rules of Civil Procedure * * *." *Bergin–Andrews*, 984 A.2d at 649. It is well-settled that "[a] Rule 60(b) motion to vacate is addressed to the trial justice's sound judicial discretion and 'will not be disturbed on appeal, absent a showing of abuse of discretion.'" *Bergin–Andrews*, 984 A.2d at 649 (quoting *Keystone Elevator Co. v. Johnson & Wales University*, 850 A.2d 912, 916 (R.I.2004)).

---

12. *Clemente v. Carnicon–Puerto Rico Management Associates, L.C.*, 52 F.3d 383, 386–87 (1st Cir.1995) held that:

"When a judge orders a view but strays from the prophylaxis that should accompany it, an offended party must bring the omissions to the judge's attention in a timeous fashion, and, if necessary, lodge a formal objection. A party's failure to take appropriate action will, in most cases, foreclose an appeal predicated on the omission of standard safeguards."

## Analysis

■■■ The plaintiff contends that several errors arose during the jury view that require us to vacate the judgment. We first address the timeliness of plaintiff's objection to those errors. We note at the outset that, in order to be timely, an objection to a ruling made at trial should be raised contemporaneously by the party, or the objection may be deemed to be waived. *See* Sup. R. Civ. P. 46;[13] *Cronan ex rel. State v. Cronan*, 774 A.2d 866, 879 (R.I. 2001) (holding that "defendant may not press these objections here when they were available for him to raise before or at the trial, yet he neglected to do so"). The record discloses that plaintiff did not raise an objection to the trip bar demonstration during the trial and, in fact, never challenged any aspect of the view until after the motion for a new trial was denied. Ordinarily, this Court will not entertain a challenge to an error that occurred during trial, but was not raised until a posttrial motion. *See State v. Albanese*, 970 A.2d 1215, 1222 (R.I.2009) (holding that an argument not made during the course of trial could not be raised for the first time in a motion for a new trial). As recognized in Rule 46, however, if a party has no opportunity to object to a ruling at the time when the ruling was made, the failure to object will not be held against the party. Given the trial justice's acknowledgment that plaintiff's counsel "may have been unaware of events that took place during [the] view" and may not have realized that a significant evidentiary event occurred during the view, plaintiff's objection is not foreclosed by the raise-or-waive rule. Ac-

cordingly, we shall determine whether the trial justice erred in refusing to grant a new trial.

■■■ We are of the opinion that in her ruling on plaintiff's motion for a new trial, the trial justice erroneously considered as evidence the events that occurred during the view, specifically, the demonstration of the trip bar. It is "well settled under Rhode Island law that the object of a view is not to obtain evidence but merely to enable the court and the jury better to understand the evidence when it is submitted." *State v. Hightower*, 661 A.2d 948, 957 (R.I.1995); *see, e.g., Sasso v. Housing Authority of Providence*, 82 R.I. 451, 457–58, 111 A.2d 226, 229 (1955) (holding that the only purpose of a jury view is to give the jury a better understanding of the evidence presented at the actual trial); *Kulpa v. General Ice Cream Corp.*, 71 R.I. 168, 174, 43 A.2d 60, 63 (1945); *State v. Smith*, 70 R.I. 500, 507, 41 A.2d 153, 156 (1945). Although in her final instructions the trial justice accurately instructed the jury that "a view is not evidence," our review of the record convinces us that the trial justice did not adhere to her own instruction. When commenting upon the evidence during the new-trial hearing, the trial justice opined that "[t]he view of the intersection, in particular, was very instructive." The trial justice went on to explain how "by way of a demonstration" the jurors learned the manner in which the traffic lights change and vehicles exiting the bus tunnel trigger the trip bar. The trial justice recognized that evidence generated from the demonstration was not

---

**13.** Rule 46 of the Superior Court Rules of Civil Procedure encapsulates the contemporaneous objection requirement when it states, in pertinent part, that:

"[I]t is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the ac-

tion which the party desires the court to take or the party's objection to the action of the court and the party's grounds therefor if requested; and if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice the party."

introduced at trial, noting that "Mr. Hathaway had not mentioned any of this during his testimony." The trial justice nonetheless concluded that "[t]he view clarified things." Thus, it appears that in denying the motion for a new trial, the trial justice relied upon evidence produced during the view.[14] This especially is a cause for concern in view of the trial justice's conclusion that plaintiff was a credible witness and that Hathaway was not credible, and that, in addition to his lack of credibility, there was evidence of Hathaway's negligence because he failed to see plaintiff in the intersection before he hit her. We are of the opinion that this was error and that a new trial should have been granted.

■■■ When ruling upon a motion for a new trial and functioning as the "seventh juror," the trial justice has an obligation to "independently weigh the material evidence in light of his [or her] charge to the jury * * *." *Cartier v. State*, 420 A.2d 843, 847 (R.I.1980). Here, the trial justice's characterization of the view as a "demonstration," and her consideration of evidence produced during the view, undermined her role as the seventh juror and disregarded our well-settled jurisprudence that a view is not evidence.

■■■ We also note that, during the hearing, the trial justice acknowledged that her instruction regarding the view appeared to confuse the jurors. The trial justice also stated that the jurors "probably should have been instructed that they could consider the facts learned from the demonstration as evidence," without considering whether the jury may have done so. In light of this record, we cannot determine whether the jury considered the view as evidence in reaching its verdict, and we are not convinced that the error was harmless. The functioning of the traffic lights and whether Yi Gu had a "walk" signal are issues that go to the heart of this case and are questions for the jury that should be determined based on admissible evidence produced in the courtroom.

Furthermore, we are of the opinion that the manner in which the view unfolded constituted reversible error. The record suggests that the demonstration occurred during an off-the-record event in which there was no assurance that all counsel, or even all of the jurors, were present, were apprised of what was transpiring, and were able to see the demonstration. *See Clemente*, 52 F.3d at 386 (describing the importance of the court employing "some method of fully and accurately recording that which transpires at the view" and ensuring that counsel has a meaningful opportunity to be present); *Kurczy v. St. Joseph Veterans Association, Inc.*, 820 A.2d 929, 955 n. 12 (R.I.2003) (noting that it was improper for the trial justice to respond to the jury's question without first consulting counsel). The trial justice's own recollection of the view was that the jurors "split up and move[d] about the intersection" and were "wandering around the area of the intersection * * * looking at it from different vantage points * * * going from corner to corner * * * conducting their own demonstration with crosswalk signals and the light signals."

Additionally, although in her final instructions the trial justice charged the jurors that a view does not constitute evidence, she neglected to give that instruction before the jury embarked on the

---

14. Applying the information obtained from the view, the trial justice also speculated about various scenarios that could have precipitated the accident, including the possibility that Hathaway's bus triggered the trip bar and caused the traffic light to change so quickly that plaintiff, who had already begun to cross the street, did not have time to finish crossing before the bus turned.

view. *See Clemente*, 52 F.3d at 386 ("[B]ecause * * * a view does not itself constitute or generate evidence, the jury should be instructed *prior* to embarking on the view that the view itself is not evidence * * *.") (emphasis added). The trial justice also failed to give an instruction to the jury before the view that they were not to discuss the case with the trial justice or with each other during the view.[15] The facts in the record strongly suggest that communications took place during the view—specifically the indications in the record that the demonstration was prompted by a juror's comments and that several jurors coordinated their efforts in an attempt to activate the trip bar by jumping on it. The trial justice's own account of the view described how the jurors talked among themselves and "clustered in groups."

The trial justice's later instruction that "[t]he view itself isn't evidence" cannot negate the series of errors that pervaded the view. We are of the opinion that the proper prophylaxes meant to safeguard the integrity of the view were absent in this case, to the extent that a new trial is required.

### Conclusion

For the reasons set forth in this opinion, we vacate the judgment of the Superior Court and remand the case for a new trial. The papers in the case may be remanded to the Superior Court.

---

**15.** In *Patterson v. Colorado ex rel. the Attorney General of Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907), Justice Holmes, writing for the Court, eloquently expounded upon "[t]he theory of our system * * * that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." As the gatekeeper, it is the trial justice's duty to ensure that the jury understands what constitutes permissible evidence. *See, e.g., Gallucci v. Humbyrd*, 709 A.2d 1059, 1064 (R.I.1998) (describing the gatekeeper function of the trial justice).