April 2, 2021

**Supreme Court**

No. 2018-92-Appeal.
(PC 14-174)

Michael J. Salvatore            :

            v.                   :

Thomas A. Palangio.            :


NOTICE:   This opinion is subject to formal revision
before publication in the Rhode Island Reporter.  Readers
are requested to notify the Opinion Analyst, Supreme
Court of Rhode Island, 250 Benefit Street, Providence,
Rhode Island 02903, at Telephone (401) 222-3258 or
Email    opinionanalyst@courts.ri.gov,    of    any
typographical  or  other  formal  errors  in  order  that
corrections may be made before the opinion is published.

Michael J. Salvatore      :

v.      :

Thomas A. Palangio.      :

Present:  Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

# O P I N I O N

**Justice Robinson, for the Court.**  This case arises out of a dispute between the plaintiff, Michael Salvatore, and the defendant, Thomas Palangio, concerning the purchase and sale of certain real property in Pawtucket, Rhode Island.  The dispute between the parties eventually resulted in litigation in the Providence County Superior Court and, finally, in a jury trial in November of 2017.  The jury was instructed to consider only the promissory estoppel and unjust enrichment counts at issue; and, on November 10, 2017, the jury returned a verdict in favor of Mr. Salvatore on those two counts.  Mr. Palangio then filed a renewed motion for judgment as a matter of law or, in the alternative, a motion for a new trial.  The trial justice denied both motions, and Mr. Palangio timely appealed, contending

- 1 -

that the trial justice erred in denying those motions. This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be summarily decided. After examining the written and oral submissions of the parties, we are of the opinion that cause has not been shown and that the appeal may be resolved without further briefing or argument.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

Mr. Salvatore has maintained that, from 2005 until 2015, he made payments to Mr. Palangio in an amount exceeding $170,000. Mr. Salvatore has further alleged that Mr. Palangio consistently represented that all payments made by Mr. Salvatore during that time would be credited toward his eventual purchase of a particular parcel of real estate owned by Mr. Palangio at 610 Weeden Street in Pawtucket (the Weeden Street property). Mr. Palangio, by contrast, has maintained that the payments made to him by Mr. Salvatore were compensation for Mr. Palangio's work as Mr. Salvatore's agent in the automotive business.

On May 29, 2015, Mr. Salvatore filed an eight-count amended complaint[1] in Superior Court; Mr. Palangio was the only named defendant. The amended complaint contains the following counts: promissory estoppel (Count One); fraud in the inducement (Count Two); intentional misrepresentation (Count Three); unjust enrichment (Count Four); unlawful appropriation in violation of G.L. 1956 § 11-41-11.1 (Count Five); false pretenses in violation of § 11-41-4 (Count Six); violation of G.L. 1956 § 36-14-5 (prohibited activity under the Code of Ethics for public officers and employees) (Count Seven); and a request for injunctive relief (Count Eight).

Before the trial commenced, Mr. Palangio filed a motion *in limine* seeking to preclude any references to Mr. Palangio's former status as a state representative. He further moved to strike Counts Five, Six, and Seven of the amended complaint. He contended essentially that the introduction of evidence as to these counts would have a "prejudicial effect and would certainly confuse the jury."

After a hearing, the trial justice denied the motion *in limine*. He did state, however, that he would limit the number of references made during trial to Mr. Palangio's former status as a state representative if "it's getting out of hand and it's being used from [*sic*] some purpose other than the facts that are being testified

---

[1] On January 13, 2014, a verified complaint was filed on Mr. Salvatore's behalf. After new counsel entered the case, an amended complaint was filed on May 29, 2015.

to * * *." The trial justice also denied the motions to strike Counts Five, Six, and Seven before trial; but he went on to explicitly state: "[I]f at the end of the Plaintiff's case there is not evidence before the [c]ourt or jury where a jury could find the elements of these offenses by a fair preponderance of the evidence, the [c]ourt will dismiss those causes of action."

The case was heard by a jury on various dates in November of 2017. We relate below the salient aspects of what transpired at that trial.

## A

### The Testimony of Michael Salvatore

Mr. Salvatore testified that he owned and operated two small businesses, State Towing Service, Inc. (State Towing) and State Auto Sales and Repair (State Auto Sales); he added that he had also owned fifteen to seventeen pieces of real estate throughout his career.[2] He further testified that, although State Auto Sales dealt with "used cars, a little bit of retail, [and] a little bit of wholesale," the "biggest part is the towing end." In fact, Mr. Salvatore testified that the services of State Towing were utilized by various clients, including "the Providence police

---

[2] Mr. Salvatore testified that, to facilitate the operation of his various businesses, he had employed a bookkeeper, an accountant, and an attorney, all of whom managed many of the formal and administrative aspects of his businesses. However, Mr. Salvatore also testified that, even though he did employ these professionals, he still personally conducted in an informal manner some of his business transactions—including several real estate transactions which started out as "handshake" agreements and only later were formalized.

tow list, Rhode Island state police tow list, the Providence Housing Authority, along with the Rhode Island Housing authority and then various private properties, properties located in the [*sic*] downtown Providence throughout the City of Providence, North Providence."

Mr. Salvatore stated that, although he and Mr. Palangio were distant cousins, they did not become familiar with each other until 2005. Mr. Salvatore further stated that, after he began associating with Mr. Palangio in 2005, Mr. Palangio told Mr. Salvatore that he "owned land in Pawtucket and he was going to be selling it and he thought it would be a perfect opportunity for [Mr. Salvatore] to purchase it in the nature of the business that [Mr. Salvatore is] in." Mr. Salvatore testified that he later learned that the land to which Mr. Palangio had referred was located in Pawtucket. He further testified that Mr. Palangio told him that acquiring the property in Pawtucket would "increase [Mr. Salvatore's] business" because, as a result of its location, he would be able to be on the Pawtucket and Central Falls police tow lists.

Mr. Salvatore testified that, at some point in late 2005 or early 2006, after having had several conversations with Mr. Palangio about the Weeden Street property, he accompanied him to view the property. Mr. Salvatore stated that the two of them viewed the Weeden Street property—which consisted of a vacant lot as well as a building—for some twenty to thirty minutes. He further stated that

Mr. Palangio offered to sell the vacant lot for $100,000 and to sell the building for another $100,000. Mr. Salvatore then testified that, in 2006 or 2007, he met with Mr. Palangio and one Nicholas D'Amico, who was Mr. Palangio's business partner and co-owner of the Weeden Street property. He further testified that, when Mr. Palangio introduced him to Mr. D'Amico, Mr. Palangio "explained to Mr. D'Amico that [his] cousin [Mr. Salvatore] is going to be purchasing this property." He stated that Mr. Palangio further said: "I'm going to help [Mr. Salvatore] get on the Pawtucket Central Falls police tow list so he can have a second location for his towing business."

Mr. Salvatore further testified that, before he had received any formal documentation, he made ten to twelve payments to Mr. Palangio with his understanding being that the payments would be credited toward his purchase of the Weeden Street property. He further testified that, in 2007, Mr. Palangio presented him with a document entitled "Offer to Purchase Real Estate" (the Purchase Agreement), which document was entered as an exhibit at trial. On that document, Mr. Palangio had handwritten pertinent information about the property—including a description of the land, the purchase price of the vacant lot, and a right of first refusal to purchase the building adjacent to the vacant lot. Mr. Salvatore stated that he signed the Purchase Agreement in the presence of Mr. Palangio, who told Mr. Salvatore that both he and Mr. D'Amico would

subsequently sign the document. Neither Mr. Palangio nor Mr. D'Amico ever signed the Purchase Agreement, and Mr. Salvatore testified that he "never saw that document again."

Mr. Salvatore testified that he made numerous payments to Mr. Palangio, which varied in amount.[3] He stated that, in addition to vehicle repair services, those payments consisted of cash and checks and health insurance payments. Notably, Mr. Salvatore testified that, when he wrote the checks to Mr. Palangio, he included various notations on the memorandum line referencing the Weeden Street property; the checks, which were entered as exhibits at trial, included notations which stated "Pawt land" and "land Pawt." Furthermore, he stated that, following Mr. Palangio's advice, he paid $2,500 for the services of a surveyor, who was recommended by Mr. Palangio, to conduct a survey of the property.

Mr. Salvatore testified that, at some point at the end of 2013 or in 2014, he "took it [that] the property wasn't being put in [his] name," and he ceased making payments to Mr. Palangio. Mr. Salvatore further testified that, although he made many attempts to speak to Mr. Palangio about the transfer of the property, Mr. Palangio did not manifest any intent to deed the property to him. Mr. Salvatore also testified that he then requested that Mr. Palangio refund all the money that he

---

[3] Mr. Salvatore testified that Mr. Palangio would periodically request a certain amount of money and that he would write him a check for that amount.

had paid toward his purchase of the property. He added, however, that his attempts at obtaining a refund came to an end at some point in 2014, when Mr. Palangio threatened to file a restraining order against him and to have his business removed from the state police tow list.[4]

Mr. Salvatore has consistently maintained that he never received either the Weeden Street property or anything else of value from Mr. Palangio as a result of the various payments which he made to Mr. Palangio.

**B**

**The Testimony of Thomas Palangio**

Mr. Palangio testified that, beginning in approximately 1986, he started participating in the used car business and that he also bought and sold both commercial and residential real estate. He stated that he had purchased ten to twelve properties since 1986, including the Weeden Street property, which he purchased along with Mr. D'Amico. Mr. Palangio further stated that, a few years after making that purchase, he "sold [his] portion of the building" on the Weeden Street property to Mr. D'Amico, but they maintained shared ownership over the

---

[4]    Mr. Salvatore testified that towing was the largest part of his business, and he said that he believed that Mr. Palangio had the ability to have his business removed from tow lists as a consequence of Mr. Palangio's status as a state representative at that time.

vacant lot on the property. Mr. Palangio then stated that, in 2012 or 2013, Mr. D'Amico "relinquished his portion" of the vacant lot to him.

As for his relationship with Mr. Salvatore, Mr. Palangio testified that he acted as Mr. Salvatore's agent with respect to the automotive business and that he would "conduct [such] business through [Mr. Salvatore's] license." He stated that he would go to various automotive auctions and would purchase vehicles with his own funds if he found something of value. He further stated that, when he returned from auctions, he and Mr. Salvatore would "settle up;" he further explained that Mr. Salvatore "would purchase the car off [Mr. Palangio] to resell it." Mr. Palangio testified that he and Mr. Salvatore "had an arrangement" as to how Mr. Salvatore would pay him for the cars and any repair work or "things of that nature[.]" He specifically testified that their payment arrangement was "kind of confusing" and that "some of these checks are bizarre amounts because you're offsetting a brake job and muffler work and tie rods, so you end up with all of these disjointed numbers." However, he further testified that none of the payments Mr. Salvatore made to him had anything to do with land or property in Pawtucket, and he added that "[t]o assume it's for land is fantasy, and the Plaintiff knows that."[5] In fact, he testified that he never promised to sell, or caused Mr. Salvatore

---

[5]    Mr. Palangio also stated that he never told Mr. Salvatore to reference the Pawtucket property in the memorandum line of the checks. He specifically stated at trial: "I would never suggest to someone to put something in a memo. It's their

- 9 -

to believe that he would sell, any piece of property in Pawtucket between 2005 and the time of trial in 2017.[6]

## C

## The Testimony of Nicholas D'Amico

Mr. D'Amico testified that he and Mr. Palangio were partners with respect to ownership of the vacant lot on Weeden Street and that he owned the building attached to that lot.  He further testified that he did not recall ever meeting with Mr. Salvatore in 2005 at the Weeden Street property or at any time thereafter.  He also stated that he had no knowledge of the checks which Mr. Salvatore said he had provided to Mr. Palangio for the Weeden Street property.

## D

## The Trial and the Post-Trial Motions

At the close of Mr. Salvatore's case-in-chief and again at the close of all the evidence, Mr. Palangio made a number of motions to dismiss the counts in the amended complaint.  As of the time the jury began deliberating, the trial justice had dismissed all counts, with the exception of the counts sounding in promissory

check.  It's not my check.  It's their's [*sic*], so why would I suggest someone -- no, I wouldn't."

[6] We also note that Mr. Palangio disputed most, if not all, of Mr. Salvatore's claims.  For instance, he denied having any conversations with Mr. Salvatore about selling property in Pawtucket, having any knowledge about Mr. Salvatore's business being placed on a city's tow list, or being aware that Mr. Salvatore was giving him checks for property in Pawtucket.

- 10 -

estoppel and unjust enrichment. Those two counts were submitted to the jury; and, on November 10, 2017, the jury returned a verdict for Mr. Salvatore. Damages in the amount of $80,815 were awarded, to which sum interest and costs were added.

Following the entry of judgment in Mr. Salvatore's favor, Mr. Palangio filed a renewed motion for judgment as a matter of law or, in the alternative, a motion for a new trial pursuant to Rules 50(b) and 59 of the Superior Court Rules of Civil Procedure. After a hearing, the trial justice denied both motions, and Mr. Palangio timely appealed to this Court.

**II**

**Analysis**

On appeal, Mr. Palangio argues that the trial justice abused his discretion by permitting references to be made during trial to Mr. Palangio's former status as a state representative; and he also contends that the trial justice erred by failing to strike Counts Five, Six, and Seven of the amended complaint before trial. Mr. Palangio further argues that he was entitled to judgment as a matter of law or, in the alternative, a new trial as to the promissory estoppel and unjust enrichment claims.[7] More specifically, Mr. Palangio contends that no reasonable jury could

---

[7] In light of our determination that a reasonable jury could have reached the conclusion which this jury in fact reached on the promissory estoppel count, we need not and so do not reach the issue of unjust enrichment. *See, e.g.*, *Grady v. Narragansett Electric Co.*, 962 A.2d 34, 42 n.4 (R.I. 2009); *see also Bucci v. Hurd Buick Pontiac GMC Truck, LLC*, 85 A.3d 1160, 1171 n.4 (R.I. 2014).

have concluded that there was a clear and unambiguous promise with respect to the purchase and sale of the Weeden Street property or that Mr. Salvatore's reliance on Mr. Palangio's statements about said property was reasonable. We are not persuaded by Mr. Palangio's contentions.

## A

### The Motion *in Limine* and the Motions to Strike

Mr. Palangio maintains on appeal that "the trial justice abused his discretion when he denied his Motion to Strike Counts V, VI and VII and Defendant's Motion in Limine to exclude any reference to Mr. Palangio's title as a state representative." This Court reviews "the grant or denial of a motion *in limine* for an abuse of discretion." *State v. Marte*, 92 A.3d 148, 150 (R.I. 2014) (internal quotation marks omitted). And, similarly, when we review a ruling on a motion to strike, we do so pursuant to the same standard of review. *Long v. Dell, Inc.*, 93 A.3d 988, 1005 (R.I. 2014). We perceive no basis for concluding that the trial justice abused his discretion with respect to either the motion *in limine* or the motions to strike.

### 1. The Motion *in Limine* Concerning the State Representative Issue

Mr. Palangio argues on appeal that the trial justice abused his discretion by denying Mr. Palangio's motion *in limine* seeking to exclude any reference to his status as a state representative and by permitting such references to be made during

- 12 -

trial. After counsel for both parties were heard with respect to this motion, the trial justice ruled as follows prior to trial:

> "The [c]ourt is going to do a couple of things. It's going to deny the motion. However, the [c]ourt is mindful of the fact that our Supreme Court has referenced in a criminal context it's fine to refer to a complaining witness as a victim but it's not okay to do that l5, 20, 25 times. So, certainly, while the [c]ourt will allow that to be used. [*sic*] If the [c]ourt believes, and we will have a sidebar if it goes that way, that it's getting out of hand and it's being used from [*sic*] some purpose other than the facts that are being testified to, the [c]ourt reserves the right to put that to a halt."

We are satisfied that the trial justice did not abuse his discretion in denying the motion to exclude *any* reference to Mr. Palangio's status as a state representative, while at the same time permitting *limited* references to said status during trial. It is clear to us that *some* reference to that status was necessary in view of the allegations made in Counts Five, Six, and Seven in the amended complaint. We further note that, during trial, counsel for Mr. Salvatore adequately abided by the trial justice's ruling, given that any such references were infrequent, and no such references were included in his opening statement or closing argument.

### 2. The Motions to Strike Counts Five, Six, and Seven

Mr. Palangio also argues on appeal that the trial justice abused his discretion when he initially denied Mr. Palangio's motions to strike Counts Five, Six, and Seven of the amended complaint and when he permitted the jury to hear evidence

related to those counts. He specifically contends that Counts Five and Six "injected accusations of criminal conduct which likely confused and prejudiced the jury * * *." He further contends that, "[b]y allowing the jury to contemplate the testimony regarding Count VII, the [c]ourt essentially acquiesced [that] there was a factual and legal basis to consider that Palangio abused his public office and the public trust."

After careful consideration, we perceive no basis for finding an abuse of discretion in the trial justice's rulings concerning the motions to strike. We would point out that all three counts were dismissed before the jury deliberated, and there was no reference to them in the trial justice's instructions to the jury. And it is well settled that "the members of the jury are presumed to follow the trial justice's instructions." *Oden v. Schwartz*, 71 A.3d 438, 455 (R.I. 2013) (quoting *State v. Clark*, 754 A.2d 73, 80 (R.I. 2000)). In our judgment, the trial justice's decision not to rule on the motions to strike before the trial began constituted a sustainable exercise of his discretion. It is a basic principle of our jurisprudence that "[t]he standard of abuse of discretion is one that gives extreme deference to the trial justice's determination." *State v. Remy*, 910 A.2d 793, 797 (R.I. 2006) (quoting *State v. Werner*, 831 A.2d 183, 204 (R.I. 2003)). And we have expressly stated that "we may uphold a trial justice's ruling even if we would have ruled differently had we been in the trial justice's position." *State v. Gillespie*, 960 A.2d 969, 980

(R.I. 2008); *see also National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642 (1976).

## B

## The Motion for Judgment as a Matter of Law

When ruling on a motion for judgment as a matter of law, this Court reviews the trial justice's decision in a *de novo* manner. *Rhode Island Resource Recovery Corp. v. Restivo Monacelli LLP*, 189 A.3d 539, 545 (R.I. 2018). It is well established that, when conducting that review, we employ the same standard as did the trial justice. *Botelho v. Caster's Inc.*, 970 A.2d 541, 544 (R.I. 2009); *Bajakian v. Erinakes*, 880 A.2d 843, 849 (R.I. 2005). The trial justice, and this Court on review, must examine "the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses * * *." *Filippi v. Filippi*, 818 A.2d 608, 617 (R.I. 2003) (internal quotation marks omitted). At the conclusion of that reviewing process, the trial justice must be guided by "the principle that, if the evidence viewed in the light most favorable to the party opposing the Rule 50 motion '*would justify a reasonable jury's finding* for the plaintiff, the jury is entitled to decide the facts and the motion should be denied.'" *Bajakian*, 880 A.2d at 849-50 (emphasis added) (quoting *Cinq-Mars v. Rodriguez*, 674 A.2d 401, 405 (R.I. 1996)).

- 15 -

Mr. Palangio argues that, as to the promissory estoppel claim, he is entitled to judgment as a matter of law. He specifically contends that no reasonable jury could have found that Mr. Salvatore established a prima facie case of promissory estoppel. Accordingly, he argues that the trial justice erred in denying his motion for judgment as a matter of law as to this count.

This Court has applied the doctrine of promissory estoppel to "alleviate the plight of those who [might otherwise] suffer a serious injustice as a result of their good-faith reliance on the unfulfilled promises of others." *East Providence Credit Union v. Geremia*, 103 R.I. 597, 603, 239 A.2d 725, 728 (1968); *see Filippi*, 818 A.2d at 626; *Alix v. Alix*, 497 A.2d 18, 21 (R.I. 1985). Promissory estoppel has been defined by this Court as referring to "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance [and therefore] is binding if injustice can be avoided only by enforcement of the promise." *Alix*, 497 A.2d at 21 (quoting Restatement (Second) *Contracts* § 90 at 242 (1981)); *see also Cote v. Aiello*, 148 A.3d 537, 547 (R.I. 2016); *Filippi*, 818 A.2d at 625.

This Court has quite clearly articulated a three-element approach that should be applied vis-à-vis a claim of promissory estoppel. *See Filippi*, 818 A.2d at 626; *see also Cote*, 148 A.3d at 547. In *Filippi*, we employed the following straightforward and formulaic language to describe what must be found for the

- 16 -

doctrine of promissory estoppel to be applicable: (1) a "clear and unambiguous promise;" (2) "[r]easonable and justifiable reliance upon the promise;" and (3) "[d]etriment to the promisee, caused by his or her reliance on the promise." *Filippi*, 818 A.2d at 626.

### 1. Clear and Unambiguous Promise

Mr. Palangio contends that no reasonable jury could have concluded that there was a clear and unambiguous promise sufficient to meet the first element of promissory estoppel. In support of his argument, Mr. Palangio points to: (1) the fact that Mr. Salvatore "reversed legal theories between the filing of the Verified Complaint and the Amended Complaint;" (2) the fact that Mr. Salvatore's testimony "was conflicting in the purchase price, the method of payment, the date and any other terms that are required to establish a right to recover under the theory of promissory estoppel;" and (3) the fact that Mr. Salvatore admitted that he "never discussed the sale" with Mr. D'Amico.

As to Mr. Palangio's first assertion, it is undisputed that there is a discrepancy between the legal theories and factual allegations set forth in Mr. Salvatore's verified complaint as contrasted with his amended complaint. We are not convinced, however, that those differences provide any support for Mr. Palangio's argument that there did not exist a clear and unambiguous promise by Mr. Palangio. Although an original pleading may be used for impeachment

- 17 -

purposes, it serves no greater function.[8] *See Gormley v. Vartian*, 121 R.I. 770, 777, 403 A.2d 256, 260 (1979); *Zito v. Cassara*, 109 R.I. 112, 113 n.1, 281 A.2d 303, 303 n.1 (1971).

Mr. Palangio's second contention is also unavailing. He argues that the testimony adduced at trial "did not establish a clear and unambiguous promise concerning the details of this purported agreement, [because] Salvatore was conflicting in the purchase price, the method of payment, the date and any other terms that are required to establish a right to recover under the theory of promissory estoppel." Notably, however, Mr. Salvatore specifically testified about numerous conversations he had with Mr. Palangio, during which Mr. Palangio related to him that the purchase price of the vacant lot in Pawtucket was $100,000 and the purchase price of the building adjacent to the lot was another $100,000. Moreover, Mr. Salvatore testified that Mr. Palangio would periodically ask for specific amounts of money to be paid to him; he added that, each time Mr. Palangio asked, Mr. Salvatore would provide him with a check for the requested amount. His testimony was reinforced by the several checks which were trial exhibits and clearly contained notations on the memorandum line indicating that the payments were for land in Pawtucket. Given this evidence, a reasonable jury

---

[8] "An amended pleading is a substitute for the original and supersedes it; the original no longer performs any function in the case. No pleading nor motion need be or should be directed to it." *Zito v. Cassara*, 109 R.I. 112, 113 n.1, 281 A.2d 303, 303 n.1 (1971) (quoting 1 Kent, R.I. Civ. Prac. § 15.7 at 154 (1969)).

could certainly choose to believe that Mr. Salvatore paid Mr. Palangio in excess of $170,000, with his understanding being that all payments would be credited toward the $200,000 purchase price of the Weeden Street property.[9]

There was further evidence that, at some point following those initial conversations and after Mr. Salvatore had already made ten or twelve payments to Mr. Palangio, Mr. Palangio presented Mr. Salvatore with the Purchase Agreement relating to the subject property, with most of the pertinent information being handwritten. Notably, the Purchase Agreement set forth the names of the co-owners of the property (Mr. Palangio and Mr. D'Amico), a description of the property, and a purchase price of $100,000.[10] We do not hold (nor do we need to

---

[9] Mr. Palangio detailed a different version of events. Mr. Palangio has consistently contended that those payments served a different purpose. According to Mr. Palangio's memorandum filed pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure, he has maintained that, from 2005 through 2012, he was "a designated agent on behalf of Salvatore's business, 'State Auto Sales[,]' purchasing vehicles at auto auctions" and that, after purchasing the vehicles, he would "then sell them to Salvatore." Which scenario was to be believed presented a classic issue of credibility—the resolution of which was for the jury. *See King v. Huntress, Inc.*, 94 A.3d 467, 495 (R.I. 2014) ("We have repeatedly held that 'neither a witness's prior contradictory statements nor the inconsistencies in his testimony inhibit a fact finder's right to accept the witness as credible, and to pick and choose from his testimony what portions he deems worthy of belief.'") (quoting *Russian v. Lipet*, 103 R.I. 461, 464, 238 A.2d 369, 371 (1968)).

[10] The Purchase Agreement included only the purchase price of $100,000. Mr. Salvatore testified, however, that the parties agreed that Mr. Salvatore would pay Mr. Palangio $100,000 for the vacant lot and another $100,000 for the building, as to which he had a right of first refusal.

do so for present purposes) that the partially signed Purchase Agreement was of and by itself an enforceable written contract between the parties; nor is it our view that what transpired between these parties constituted the soundest of business practices. We do hold, however, that the Purchase Agreement coupled with the checks and the annotations thereon, as well as the testimonial evidence, constituted a basis upon which a reasonable jury could conclude that there was a clear and unambiguous promise by Mr. Palangio to sell the Weeden Street property to Mr. Salvatore for the indicated amount. *Filippi*, 818 A.2d at 626; *see Cote*, 148 A.3d at 547.

We are also of the opinion that a reasonable jury could reject as being not credible Mr. D'Amico's testimony denying that there was ever a meeting between him and Mr. Salvatore with respect to the sale of land in Pawtucket. Mr. Salvatore testified that, during his second visit to the subject property in 2006 or 2007, Mr. Palangio introduced him to Mr. D'Amico. Mr. Salvatore further testified that, while the three men were together at the site, Mr. Palangio "explained to Mr. D'Amico that [his] cousin [Mr. Salvatore] is going to be purchasing this property" and that he was "going to help [Mr. Salvatore] get on the Pawtucket Central Falls police tow list so [Mr. Salvatore] can have a second location for his towing business." Although Mr. D'Amico did not recall ever meeting Mr. Salvatore, once

again, it was for the jury to wrestle with the issue of credibility. *See King v. Huntress, Inc.*, 94 A.3d 467, 495 (R.I. 2014).

Mr. Palangio further argues that, when there are two owners of a property, it is not reasonable for a person to rely on a promise to sell the property made by only one of the owners when the other owner remains silent. In support of that argument, he rather summarily seeks to analogize the situation in this case to that in *Dellagrotta v. Dellagrotta*, 873 A.2d 101 (R.I. 2005). However, we are not at all persuaded by Mr. Palangio's argument with respect to *Dellagrotta*. Mr. Palangio relies upon statements made by the trial justice in that case without noting what this Court actually did and did not say. The trial justice in *Dellagrotta* found that, because the co-owner of the subject property made no statement to the defendant about any intention to convey the property, the defendant was not reasonable in relying on statements made by the other co-owner with respect to the transfer of that property. *Dellagrotta*, 873 A.2d at 107. However, on appeal, we specifically stated that, because the defendant in *Dellagrotta* had been unable to establish the first element under the doctrine of promissory estoppel, we would decline to decide "whether [one owner's] *silence* in the face of [the other owner's] promise was sufficient to bind her on that promise." *Id.* at 110 (emphasis added).

Moreover, we would point out that *Dellagrotta* is further distinguishable on its facts from the instant case. In *Dellagrotta*, there was *no evidence* that the co-

- 21 -

owner of the property was at all involved in any discussions with the defendant which could have reasonably induced her to rely on statements with respect to ownership of the property that were made by the other co-owner. *Id.* at 107. In the present case, however, evidence was presented such that a reasonable jury could have found that Mr. D'Amico had some degree of involvement with respect to the proposed sale of the Weeden Street property to Mr. Salvatore. In addition to the meeting at the subject property which, according to Mr. Salvatore's testimony, Mr. D'Amico attended, it is significant that both Mr. Palangio and Mr. D'Amico were named on the Purchase Agreement, which was drafted by Mr. Palangio. It is our view that there existed sufficient evidence for a jury to reasonably conclude that there was actual involvement on Mr. D'Amico's part in the sale of the Pawtucket property.

For all of these reasons, we are of the opinion that a reasonable jury could have found that Mr. Salvatore sufficiently established the first element relative to his claim based on promissory estoppel.

### 2. Reasonable and Justifiable Reliance

Mr. Palangio also contends that "no reasonable jury [could] conclude that Salvatore's reliance was reasonable." He bases this argument on the fact that Mr. Salvatore "acknowledged that he owned approximately 15-17 properties in his experience and that he had attorneys who assisted him in * * * real estate

transactions and also with his various business ventures." Mr. Palangio further asserts that, in spite of the fact that he and Mr. Salvatore were distant cousins, they had "virtually no relationship" and that there was thus no reason why Mr. Salvatore should have expected to receive title to Mr. Palangio's property based upon approximately a half-dozen conversations in addition to Mr. Salvatore having made unusual incremental payments to Mr. Palangio over a period of approximately seven years.

We consider Mr. Palangio's arguments in this regard to be meritless. It is true that Mr. Salvatore testified that, in order to manage many of the formal and administrative aspects of his businesses, he sought the assistance of a bookkeeper, an accountant, and an attorney. It was further Mr. Salvatore's testimony, however, that, although many of his business transactions were conducted in a relatively formal manner and were facilitated by the services of such professionals, several of his business transactions began as "handshake" agreements that were later formalized. Even though the agreement at issue in this case appears to have started out on a "handshake" basis, Mr. Salvatore's reliance was based upon more than just "vague statements" about a future business opportunity. *Cote*, 148 A.3d at 548 (internal quotation marks omitted). Instead, he testified that he based his reliance on several discussions, during which Mr. Palangio consistently expressed a willingness to sell the subject property, Mr. Palangio's acceptance of payments

- 23 -

ultimately amounting to over $170,000, and his understanding that Mr. Palangio was formalizing the terms of their verbal agreement by means of the Purchase Agreement that had been presented to him by Mr. Palangio and that he had signed and returned to Mr. Palangio. Importantly, prior to the end of 2014, when Mr. Salvatore stopped making payments after having already made numerous payments, Mr. Salvatore testified that he had perceived no indication that Mr. Palangio would not transfer the Pawtucket property to him. *See Filippi*, 818 A.2d at 627. We thus hold that a reasonable jury could, based on the evidence before it, have believed that Mr. Salvatore's reliance on Mr. Palangio's repeated promises to sell the property in Pawtucket to him was reasonable, thereby satisfying the second prong of the test for promissory estoppel.

### 3. Detriment to Promisee

We are satisfied that, as a result of his reliance on Mr. Palangio's repeated statements with respect to the Weeden Street property, there was evidence on which a reasonable jury could have relied in concluding that Mr. Salvatore suffered a detriment. Mr. Palangio opted not to contend that, if the first two elements of a promissory estoppel claim were properly established (as we have held they were), then there would be a detriment to the promisee—at least in this case. *See Filippi*, 818 A.2d at 627. Accordingly, we need say no more about this element.

- 24 -

We conclude, after examining the evidence in the light most favorable to Mr. Salvatore, that a reasonable jury could have found that Mr. Salvatore sufficiently established all three elements of his claim based on the doctrine of promissory estoppel. Accordingly, we hold that the trial justice did not err in denying Mr. Palangio's motion for judgment as a matter of law as to the promissory estoppel count.

## C

### The Motion for a New Trial

We have stated that, when ruling on a motion for a new trial, the trial justice functions as a "seventh juror[.]" *Yi Gu v. Rhode Island Public Transit Authority*, 38 A.3d 1093, 1101 (R.I. 2012) (internal quotation marks omitted). When assuming that role, "a trial justice, in the exercise of his or her independent judgment, * * * must weigh the evidence and assess the credibility of the witnesses." *Mead v. Sanofi-Aventis U.S., Inc.*, 62 A.3d 512, 517 (R.I. 2013) (internal quotation marks omitted). The trial justice is authorized to "reject some evidence and draw inferences which are reasonable in view of the testimony and evidence in the record." *Kurczy v. St. Joseph Veterans Association, Inc.*, 713 A.2d 766, 770 (R.I. 1998) (internal quotation marks omitted); *see Yi Gu*, 38 A.3d at 1099. If the trial justice "determines that the evidence is evenly balanced or is such that reasonable minds in considering the same evidence could come to

different conclusions, the trial justice must allow the verdict to stand." *Botelho*, 970 A.2d at 545.

When the grant or denial of a motion for a new trial is before us on appeal, we "will not disturb the decision of the trial justice * * * unless the plaintiff can show that the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." *Almonte v. Kurl*, 46 A.3d 1, 17 (R.I. 2012) (internal quotation marks omitted); *see also Yi Gu*, 38 A.3d at 1099; *Bajakian*, 880 A.2d at 852. And, during that review, if "the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his even though a contrary conclusion could have been reached." *Tim Hennigan Co., Inc. v. Anthony A. Nunes, Inc.*, 437 A.2d 1355, 1357 (R.I. 1981).

The trial justice properly conducted the required analysis in ruling on Mr. Palangio's motion for a new trial. After pointing to the relevant testimony adduced at trial, the trial justice candidly observed that the testimony "before the jury was very, very much conflicting * * *." He further stated that "the jury had to take very, very different versions of events as testified by the Plaintiff and the Defendant * * * and decide who they believe and who they did not believe in this case." He concluded as follows:

> "Ultimately, the [c]ourt finds that there was evidence
> before the jury, where the jury, if they believed the

> Plaintiff either in whole or in part could have found on the promissory estoppel claim, and if they believed the Defendant, they would not. But that is the role of the jury, not the [c]ourt, and the jury made a decision."

As the just-quoted statement by the trial justice cogently points out, it was the jury's role to make decisions as to "the relative credibility of witnesses"[11]—and that is precisely what it did. *See generally Boscia v. Massaro*, 529 A.2d 504, 508 (Pa. Super. Ct. 1987) ("In our system of justice, the jury is sacrosanct and its importance is unquestioned. The members of a jury see and hear the witnesses as they testify. They watch them as they sweat, stutter, or swagger under the pressure of cross-examination. This enables the jury to develop a feel for the case and its personal dynamics which cannot be conveyed by the cold printed page of a record reproduced for appellate review.").

The trial justice adequately articulated his bases for finding that reasonable minds could differ based on the evidence. *See Botelho*, 970 A.2d at 549; *see also State v. Richardson*, 47 A.3d 305, 318 (R.I. 2012); *State v. Pelliccia*, 573 A.2d 682, 687 (R.I. 1990). Accordingly, we see no indication that the trial justice overlooked or misconceived relevant and material evidence or was otherwise clearly wrong.

---

[11]     *Culombe v. Connecticut*, 367 U.S. 568, 603 (1961) (Frankfurter, J.).

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.  The record may be returned to that tribunal.


Justice Flaherty participated in the decision but retired prior to its publication.


Justice Lynch Prata and Justice Long did not participate.



STATE OF RHODE ISLAND

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | Michael J. Salvatore v. Thomas A. Palangio. |
| **Case Number** | No. 2018-92-Appeal.<br>(PC 14-174) |
| **Date Opinion Filed** | April 2, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Brian P. Stern |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Nicole J. Martucci, Esq.<br>Michael A. Kelly, Esq.<br>For Defendant:<br><br>John J. DeSimone, Esq. |